GARDEN CITY PRODUCTION CREDIT ASSN., APPELLANT, V.
J. P. LANNAN, APPELLEE.

186 N. W. 2d 99

Filed April 16, 1971.   No. 37373.

Snell, Winkle & Heese, for appellant.

Wagner & Johnson, Raymond E. Baker, Gale D. Tessendorf, and Mattson, Ricketts, Gourlay & Lewis, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCown, NEWTON, and CLINTON, JJ.

WHITE, C. J.

A protected Kansas lender seeks in replevin to recover 161 head of cattle in the possession of an innocent Nebraska purchaser. The basic issue is whether, under the Uniform Commercial Code, the lender has waived his otherwise protected security interest. The judgment of the district court was against the lender. We reverse the judgment of the district court.

Section 9-306(2), U. C. C., provides: "Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

The cattle in question were from the ranch of Murlin and Doris Carter in Syracuse, Hamilton County, Kansas. The plaintiff, Garden City Production Credit Association, hereinafter referred to as P.C.A., extended the Carters a loan in 1965 to finance their farming and ranching operations. A signed financing statement, covering the cattle in question and executed and perfected pursuant to the Uniform Commercial Code of the State of Kansas, was filed with the Hamilton County register of deeds in Syracuse, Kansas, on May 2, 1966. Several subsequent security agreements were filed by P.C.A. pursuant to the Kansas Uniform Commercial Code covering farm machinery, crops, and branded likestock. On March 9, 1967, the Carters executed a security agreement which included the 161 head of cattle here involved. This agreement prohibited Carter from encumbering, removing, selling, or otherwise disposing of the cattle without the *written consent* of P.C.A., and provided the right to repossess in the event of default.

Subsequent to these security agreements, the Carters at various times did sell and remove secured property in the course of their farming and ranching operation and each time they did so without first obtaining the written consent required by the financing agreement. The record shows that after various sales, Carter endorsed all checks received for the sale of the cattle involved to P.C.A. for application on his indebtedness. Carter has never requested written consent to sell the various collateral nor has Carter ever been rebuked by P.C.A. for failing to secure the written consent required by its financing contract. Carter sold the 161 head of cattle here involved to the Western Cattle Company, hereinafter referred to as Western, a large livestock brokerage firm operating principally in western Kansas. On June 15, 1967, Western negotiated a contract between Carter and Augustin Brothers, of Shelby, Nebraska, hereinafter referred to as Augustin, for delivery of 165 head of steers on or before September 20, 1967. Mr. Daly of Western issued a sight draft on a Columbus bank for the Augustin account payable to Murlin Carter in the amount of $1,650 as part payment for the cattle. The draft was forwarded to Carter by Western and Carter endorsed it over to P.C.A. as payment under the financing contract. The draft included a notation that it was given as part payment for 165 head of cattle as per contract.

P.C.A. had knowledge of the intended sale on September 20, 1967, as Carter had informed a Mr. Jones at P.C.A. of the contract when Carter applied for an additional advance on the financing agreement in June 1967. On September 20, 1967, the contract date, Carter delivered the cattle to Western, the livestock broker, for shipment to the Augustin lots in Columbus, Nebraska. Because of rejects, only 161 head of steers were actually delivered to Nebraska. A second sight draft (in the amount of $28,537.76) was again drawn on a Colum-

bus bank, on the Augustin account, and signed by Daly of Western for Augustin.

Carter endorsed the draft over to P.C.A. and forwarded it to it for credit to his account. P.C.A. sent the draft through regular banking channels for collection. Approximately 2 weeks later, P.C.A. was informed that the draft was being dishonored for insufficient funds and was being returned.

Augustin sold the cattle to defendant Lannan, delivered possession, and received payment from Lannan. After learning of Lannan's possession of the cattle, P.C.A. caused a financing statement covering the 161 head of steers to be recorded with the county clerk of Platte County, Nebraska, thus perfecting the security interest, pursuant to the Nebraska Uniform Commercial Code; and made a demand for return of the cattle from Lannan. The demand was refused, whereupon this action commenced.

The district court found that P.C.A. had knowledge of the proposed sale; that it had failed to rebuke or object to the sale; and therefore it "had waived its security interest in the cattle."

There is no evidence in the record to support the defendant's allegation in his amended answer that P.C.A. had orally or in writing waived its security interest under the terms of the financing agreement. In essence, then, the defense to this action, in violation of the express terms of the security financing agreement, is based on the doctrine of implied consent or authorization (§ 9-306(2), U. C. C.) flowing from P.C.A.'s acknowledgment of the sale, and its failure to rebuke or object and require compliance with the express terms of the agreement when it accepted and applied the proceeds of the sale on the loan.

The evidence reveals a typical farm-ranch operation contemplating a course of dealing in the sale of farm products, and the necessity of securing credit financing for such an operation. The Uniform Commercial Code,

whatever else its objects may be, was designed to close the gap in the classic conflict between the lender and the innocent purchaser and furnish acceptable, certain, and suitable standards which would promote the necessity of and the fluidity of farm credit financing in the modern context, and at the same time facilitate the sale and exchange of collateral by furnishing a definable and ascertainable standard which purchasers could rely on. Case application is in its genesis, but an examination of the textual and court authority supports such an approach to an examination of cases in a specific factual context. See Uniform Commercial Code Bibliography, 1969 (published by the Joint Committee on Continuing Legal Education of the American Law Institute and the American Bar Association), "Article 9—Secured Transactions," pp. 87 to 101.

We have already had occasion to construe section 9-306(2), U. C. C., in a slightly different factual context, but the principles therein announced furnish the guide for an approach and a determination in the factual context of this case. In Overland Nat. Bank v. Aurora Coop. Elevator Co., 184 Neb. 843, 172 N. W. 2d 786, we held that a provision in a security agreement granting a security interest in proceeds of collateral, as well as in the collateral itself, does not amount to written consent to dispose of collateral but only a provision that should a sale, exchange, or other disposition occur, the proceeds also would be covered by the security agreement.

In the Overland case, the borrower expressly promised not to sell or otherwise dispose of the collateral. In our case here the borrower covenanted not to dispose of the collateral without written consent. The financing agreement, herein, and the provisions of section 9-306(2), U. C. C., provide that the security interest of the lender continues in any identifiable proceeds including collections received by the debtor. It is difficult to see, either considering the purpose of the code, or examining the

intent of P.C.A. and Carter in their course of dealing that there was any intention, either express or implied, on the part of P.C.A. to waive its security interest up to the point of acceptance and actual application of the proceeds of the sale. We must assume that section 9-306(2), U. C. C., was drafted with an awareness of the practical realities of farm credit financing, the market movement of chattel property, and the practical problems of a simultaneous sale and payment. This provision of the code must clearly have been designed to accommodate and to fit the practical realities of financing a farming and business operation contemplating the raising, feeding, and processing, and sale of livestock and tangible chattel property. It is uncontested in the present case that there was strict compliance with the filing and notice provisions of the code. Lannan, the purchaser, was bound by the provisions of the code and must ordinarily take the risk of a failure to make the appropriate investigation contemplated by its provisions.

In this case we have a coupling of a provision prohibiting disposition of the collateral without written consent, together with a reservation of a security interest in the proceeds of any sale. These provisions cannot be construed otherwise than a further protection for the security holder under the terms of the code, and cannot be construed as provisions which open up the door to an expanded permissiveness or consent to the borrower, or a purchaser bound by the filing and notice provisions of the code. See Overland Nat. Bank v. Aurora Coop. Elevator Co., *supra*.

Lannan, defendant here, must necessarily rely upon a previous course of dealing between the lender and the debtor, amounting to nothing more than a failure to object or rebuke the debtor for selling without written consent. At the same time P.C.A. was entitled to rely upon its agreement and the provisions of the code giving it a continuing perfected security interest in the identifiable proceeds of the sale. Considering the realities involved

in accomplishing a simultaneous exchange of property for money, we can find nothing in P.C.A.'s choice of alternatives in its previous course of dealing from which an inference could be drawn that it had waived its security agreement or that Lannan was entitled to ignore the provisions of the code because of a private and undisclosed arrangement or course of dealing between the debtor and the lender alone. It must be borne in mind that in this case we are dealing with a controversy between the lender and a third party purchaser who had no knowledge of the course of dealing between the debtor and borrower. We are not called upon here to resolve a controversy between the lender and the debtor in which such agreement or arrangement or course of dealing might be relevant to the enforcement of a security interest against the debtor's property.

We are aware that section 1-205, U. C. C., provides that a course of dealing which by previous conduct between the parties, may alter an agreement by fact recognition. But, as we have said, we fail to see how a failure to rebuke or object contemporaneous with a delivery by the debtor and acceptance of the proceeds to which the security agreement attaches, can be construed as a voluntary and intelligent waiver by the lender of its right under a perfected security agreement against a third party purchaser, and this is particularly true when the security agreement itself provides a specific means for obtaining such waiver.

The code does provide for certain situations where a security interest in collateral is defeated, even in the absence of authorization by the security agreement or by the secured party. These provisions need no detailed examination for the purpose of this case. They relate to purchasers in the ordinary course of trade and if applicable leave the secured party with only an interest in the proceeds from the sale. It is true that Western's purchase of the cattle from Carter was in good faith and without knowledge of the course of dealing between

P.C.A. and Carter. It appears that the seller, Carter, was a person engaged in selling goods of the kind purchased and that Western was a buyer in the ordinary course of business. § 1-201(19), U. C. C. *Such a buyer does not, however, take goods free of a security interest his seller created when he buys farm products from a person engaged in farming operations.* § 9-307(1), U. C. C.

The cattle herein are by definition "farm products," and they were bought from Carter, a seller engaged in *"raising*, fattening, grazing, or other farming operations." (Emphasis supplied.) § 9-109(3), U. C. C. This being the case, Western did not take the cattle free of the security interest created by the seller, Carter, under these applicable provisions of the code. It therefore appears that since Western received the cattle subject to P.C.A.'s security interest, no person who thereafter purchased the cattle from the seller was free of the security interest of P.C.A.. P.C.A. had a continuously perfected security interest by virtue of its filing a financing statement in Nebraska within 4 months of the collateral's removal to this state. See §§ 9-103(3) and 9-401(4), U. C. C.

The conclusion we come to herein is in harmony with the express provisions of section 1-205(4), U. C. C., which states: "The express terms of an agreement and an applicable course of dealing or usage of the trade shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable *express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.*" (Emphasis supplied.)

As we have pointed out the mere failure to rebuke the seller, the reasonable acceptance of the proceeds of the sale when actually delivered to apply upon the debt, are not acts which indicate intention to waive a security interest, but in the event such unreasonable act is inconsistent and contradictory of the express agreement, then the express terms control both the course of deal-

ing and the usage of trade between the parties. The action of the lender and the debtor and their course of dealings between themselves is reasonable and is consistent with the underlying policy of the code and the provision prohibiting waiver of the security interest unless expressed in writing.

We are not called upon to decide this case on the basis of our previous case law. Our decision herein is in harmony with the general rule that in order to establish a waiver of legal right there must be a clear, unequivocal and decisive act of a party showing such a purpose, or acts amounting to an estoppel on his part. 28 Am. Jur. 2d, Estoppel and Waiver, § 158, p. 842; Jessen v. Blackard, 159 Neb. 103, 65 N. W. 2d 345. In the last-mentioned case, a waiver was characterized as a "voluntary abandonment or surrender, by a capable person, of a right known by him to exist, with the intention that such right shall be surrendered and such person forever deprived of its benefit."

We observe further that the record reveals that the secured agreements here between P.C.A. and Carter were periodically reexecuted and contained a prohibition against resale without written authorization. The record shows that P.C.A. was engaged in a business involving the extension of loans on collateral involving some $60,000,000 or $70,000,000. We feel it cannot seriously be contended that P.C.A., by the methods by which it carried out its business and dealt with its debtors during the continuing contemplated process of sales of collateral farm products, intended to waive its security interest in the collateral against third party purchasers.

For the reasons given the judgment of the district court holding that there was a valid waiver of the perfected security interest of P.C.A. is reversed and the cause remanded.

REVERSED AND REMANDED.

NEWTON, J., dissenting.

Plaintiff relies on the provisions of section 9-307(1)

of the Uniform Commercial Code. The unwarranted discrimination against purchasers of farm products contained in this section has been severely criticized, has been restricted in some jurisdictions by statute, and its demise is now contemplated. See, 26 The Business Lawyer, p. 314 (No. 2, Nov., 1970); Bender's Uniform Commercial Code Service, § 9-307, p. 1-751. All other buyers in the "ordinary course of business" take free of a security interest created by the seller. One who extends credit necessarily does so on a basis of trust in the honesty and reliability of the borrower. A buyer in the ordinary course of business does not ordinarily rely on the trustworthiness of the seller. As between such a buyer and the holder of a security interest, the latter has the better opportunity to protect itself as the security holder knows with whom it is dealing whereas the buyer is often unaware of the origin of the products purchased and unable to trace them back to the original owner who created the security interest. The farm-product exception tends to restrict the free movement of such goods in commerce. It places an unwarranted responsibility on all commission firms, sale barns, auctioneers, and purchasers at public markets. In the case of fed cattle, it enables the security holder to follow through to the steak or meat on the consumer's table. Notwithstanding this situation, I am obliged to agree with the majority opinion which holds that under the existing Nebraska statute, the lien followed the cattle into defendant's hands, unless there was a waiver of the lien. When the cattle fell into the hands of Augustin Brothers, who were simply dealers in cattle and not engaged in farming operations, they became "inventory" and could have been sold free of any lien created by Augustin Brothers, but since the lien was not created by the defendant's seller, the plaintiff's lien survives.

I disagree with the result arrived at by the majority of the members of this court. It is held that since the security agreement provides that consent to sale must

be in writing, no other type of consent or waiver of this provision is valid. Section 1-103, U. C. C., provides: "Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating clause shall supplement its provisions." Section 1-107, U. C. C., provides: "Any claim or right arising out of an alleged breach can be discharged in whole or in part without consideration by a written waiver or renunciation signed and delivered by the aggrieved party." As indicated in the comments on this section, it is subject to the provisions of section 2-209(4), U. C. C., which provides: "Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver."

Gilmore, in his work entitled "Security Interests in Personal Property," in commenting on security interests in farm products states in Volume II, § 26:11, p. 715: "The usual common law rules of waiver and estoppel may of course be invoked against such a secured party, and the debtor's authority to sell the collateral may derive either from an express provision in the security agreement or from the secured party's actions or conduct. In his filed financing statement the secured party may claim not only the original collateral but its proceeds. If he does so, his interest in the proceeds continues perfected indefinitely after their receipt by the debtor. A 'proceeds' claim in a financing statement suggests, however, a financing arrangement under which the debtor is expected to sell the collateral and the secured party expects to be reimbursed from the proceeds. The statutory text stops short of saying that good faith buyers without actual notice take free of a security interest when the financing statement covers proceeds, but the Comment to § 9-306(2) cautiously remarks that such a claim 'might be considered as impliedly author-

izing sale or other disposition of the collateral, depending upon the circumstances of the parties, the nature of the collateral, the course of dealing of the parties and the usage of trade.' "

We have held that a security agreement which covers proceeds may not be deemed to authorize sale by implication. See Overland Nat. Bank v. Aurora Coop. Elevator Co., 184 Neb. 843, 172 N. W. 2d 786. It is nevertheless a factor to be considered in determining whether an implied consent to sale has been given.

In Clovis National Bank v. Thomas, 77 N. M. 554, 425 P. 2d 726, cattle subject to a security agreement containing a similar provision forbidding sale without prior written consent was dealt with. The court stated: "The plaintiff, if not expressly consenting to the questioned sales, certainly impliedly acquiesced in and consented thereto. It not only permitted Mr. Bunch, but permitted all its other debtors who granted security interests in cattle, to retain possession of the cattle and to sell the same from time to time as the debtor chose, and it relied upon the honesty of each debtor to bring in the proceeds from his sales to be applied on his indebtedness.

"Plaintiff was fully aware of its right to require its written authority to sell or otherwise dispose of the collateral, but it elected to waive this right. Waiver is the intentional abandonment or relinquishment of a known right."

In Hempstead Bank v. Andy's Car Rental System, Inc., 35 App. Div. 2d 35, 312 N. Y. S. 2d 317, an automobile rental company sold its used cars, which were subject to a security interest, to an automobile wholesaler. It was held that the purchase was not made from one in the business of selling automobiles and was therefore not made in the ordinary course of business. U. C. C., § 1-201(9). The court stated: "In sum, we hold that as a matter of law Auto Buyers did not purchase from a person in the business of selling automobiles and is not, therefore, entitled to the protection afforded to buyers

in the ordinary course of business by section 9-307 (subd. (1)) of the U. C. C. There is, however, an issue of fact on the question of implied authorization of the sales by the plaintiff; and the action should be retried and submitted to the jury on that issue alone."

In Overland Nat. Bank v. Aurora Coop. Elevator Co., *supra*, this court conceded the possibility of an implied authorization to sell.

Plaintiff cites section 9-205, U. C. C., which states that a security interest is not invalid or fraudulent against creditors because the debtor may dispose of the collateral. Suffice it to say that this section does not include bona fide purchasers for value within its purview. It is limited in its scope to persons extending credit to the debtor.

There has been some criticism of the Clovis National Bank case due to the fact that in that case the security holder did not have actual knowledge of the particular sale at issue prior to delivery of the cattle. That is not true here. Plaintiff accepted and credited upon the debtor's note the downpayment made by Augustin Brothers on the cattle. It likewise accepted and credited the final draft. It had frequently acquiesced in previous sales by the debtor and on the strength of this particular sale had made an additional loan to the debtor. Notwithstanding full knowledge of the sale before its final consummation and delivery of the cattle to the purchasers, it failed to object until the Augustin Brothers' final draft was dishonored. By that time defendant had purchased the cattle in good faith and received possession. The conduct of plaintiff evidences an intentional relinquishment of its contract-right to stop the sale and a deliberate waiver of that right. "The essential elements of a waiver, * * * are the existence, at the time of the alleged waiver, of a right, advantage, or benefit, the knowledge, actual or constructive, of the existence thereof, and an intention to relinquish such right, advantage, or benefit." 56 Am. Jur., Waiver, § 12, p. 113. All of the

elements are present in this instance and, in addition, plaintiff accepted money on its contract with the debtor although it knew he had sold the cattle contrary to the strict terms of the security agreement. "Where a party to a contract, with full knowledge of the facts and with knowledge of a breach by the other party, receives money in the performance of the contract the breach will be deemed to have been waived." Wegner v. West, 169 Neb. 546, 100 N. W. 2d 542.

There are also elements of estoppel present. By failing to question its debtor's sale of the cattle to Augustin Brothers, plaintiff made it possible for defendant to suffer from the combined acts of its debtor and Augustin Brothers. "Where one of two innocent persons must suffer by the acts of a third, the one whose conduct, act, or omission enabled such third person to occasion the loss must sustain it if the other party acted in good faith without knowledge of the facts, and altered his position to his detriment." Jordan v. Butler, 182 Neb. 626, 156 N. W. 2d 778.

I respectfully submit that the judgment of the district court should be affirmed.

McCown, J., joins in this dissent.

Boslaugh, J., dissenting.

I concur in the opinion of Newton, J., that the circumstances in this case established both an authorization of the sale by the plaintiff, which waived its security interest in the cattle sold, and a ratification of the sale by the acceptance of the proceeds. See, Farmers' Nat. Bank v. Missouri Livestock Commission Co., 53 F. 2d 991; First Nat. Bank & Trust Co. v. Stock Yards Loan Co., 65 F. 2d 226; Seymour v. Standard Live Stock Commission Co., 110 Neb. 185, 192 N. W. 398; Warrick v. Rasmussen, 112 Neb. 299, 199 N. W. 544. These long-standing principles of law and equity have not been displaced by any provision of the code. See § 1-103, U. C. C.

McCown, J., joins in this dissent.