Helen **FISHER**, Appellant,

v.

**FIRST NATIONAL BANK OF MEMPHIS, Texas,** Appellee.

No. 8970.

Court of Civil Appeals of Texas, Amarillo.

June 28, 1979.

Sanders, Saunders, Brian, Finney & Thomas, Michael Lynch, Amarillo, for appellant.

Gibson, Ochsner & Adkins, W. P. Sturdivant, Amarillo, for appellee.

DODSON, Justice.

The First National Bank of Memphis, Texas, instituted suit against Jimmy Roden to recover on a promissory note and to foreclose its alleged security lien against the proceeds from an agreed sale of cattle. The Bank joined Helen Fisher, who claimed ownership of 158 head of the cattle involved in the agreed sale,[1] and others claiming an interest in the alleged collateral as parties defendant. Mrs. Fisher filed a cross-action to recover the proceeds from the sale of cattle which she claimed. The Bank moved for summary judgment to foreclose its alleged lien on the proceeds from the cattle claimed by Mrs. Fisher. After a hearing, the trial court granted summary judgment for the Bank and severed the cause from the remaining actions against Mr. Roden and others. Mrs. Fisher appeals. Affirmed.

I.

Mrs. Fisher purchased the 158 head of cattle in question from Mr. Roden in August 1976. She maintains that the trial court erred in granting the summary judgment because Mr. Roden had no title or interest in the 158 head of cattle to which the Bank's lien could attach. Therefore, she argues that she is entitled to the proceeds from the agreed sale of the cattle. We disagree.

Section 9.203 of the Texas Business and Commerce Code (Vernon Supp. 1978–1979), in part, provides:

(a) . . . a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless

(1) . . . the debtor has signed a security agreement which contains a description of the collateral . . .; and

(2) value has been given; and

(3) the debtor has rights in the collateral.

(b) A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in Subsection (a) have taken place unless explicit agreement postpones the time of attaching.

---

1. By agreement of the parties, 135 of the 158 head of cattle were sold for $25,723.91, which was placed in a trust account. The fate of the remaining 23 head of cattle is unexplained.

The summary judgment proof conclusively establishes each of the elements necessary for attachment to occur.

On October 16, 1975, Mr. Roden executed a promissory note to the Bank for $350,000 together with a security agreement granting the Bank an interest in the following collateral: "202 Bulls and Steers w/left ear Tag; branded JR on left shoulder; Located in J. Roden feedlot East of Memphis," and "[a]ll substitutes and replacements for, accessions, attachments, and other additions to . . . the above property" and "[a]ll property similar to the above hereafter acquired by debtor."

On October 21, 1975, a finance statement naming Jimmy Roden as debtor and First National Bank of Memphis, Texas, as the secured party was filed with the County Clerk of Hall County, Texas. The statement covered all livestock belonging to Roden and located in Hall County, Texas, or wherever located.

On December 15, 1975, Mr. Roden executed another security agreement for the $350,000 indebtedness. The agreement gave the Bank a security interest in "1,207 Mixed Steers To be Branded JR on the left shoulder; Yellow Tag with name and No. in left ear; Located on debtor's own farm 3 miles East of Memphis in Hall County, Texas." The agreement also contained the same after-acquired property provisions set forth in the October 16, 1975, security agreement.

In August 1976 Mr. Roden purchased the 158 head of cattle in question from Mr. Hatcher. The cattle were tagged in the ear, branded, and placed in Mr. Roden's feedlot in Hall County, Texas. Roden gave Hatcher a check as payment for the cattle. Mr. Roden subsequently sold the cattle to Mrs. Fisher and drafted her account for $11,600. The cattle, however, remained in Roden's possession where he continued to pasture, feed, and care for the cattle pursuant to a profit-sharing arrangement with Mrs. Fisher.

Mrs. Fisher, by deposition, testified concerning the purchase of the 158 head of cattle from Mr. Roden. The testimony follows:

Q Now then, in August of 1976, you purchased additional cattle from Mr. Roden, did you not?

A Yes.

Q Would you please tell me how many head?

A 158.

Q By telephone?

A Yes.

Q Did he call you, or did you call him?

A He called me. He—if this is relevant, I don't know, he said he had bought the cattle, and a young man, whose name he didn't give me, had bought them from him at a profit, but the young man couldn't get his money right then from the FHA. And he said if I would buy the cattle, they already had a profit in them, and he couldn't carry them. He didn't have the money to carry them. So would I buy them and then I could have the sale of them, and it was more of an accommodation than anything.

Q Who did he tell you he had bought them from?

A He didn't. He just said they were Southern cattle.

Q Who did he tell you he had sold them to?

A He didn't give me the man's name, but it was young man there.

Q Sold them to some young man there?

A Indeed, I don't remember, because it was only going to be two weeks.

Q In other words, he had sold them to this young man, and this young man couldn't come up with the money?

A He was getting it from the FHA, but he didn't have his papers clear, and rather for the whole deal to fall through, Mr. Roden asked me if I would pay for the cattle, and then I would have the sale of them.

Q And pay Mr. Roden?

A Yes.

Q Is that correct?

A  Yes.

MR. SAUNDERS: And what?

MR. STURDIVANT: And pay Mr. Roden.

A  Yeah, he had paid for the cattle, but he didn't have the money to cover it in some such way. And more an accommodation than anything else, I agreed to do that for two weeks.

Q  Did you tell him to draw a Customer's Draft on you?

A  Yes, he needed the money right then.

Thus, Mrs. Fisher admits that Roden initially purchased and paid for the 158 head of cattle, yet maintains that Roden had no rights in the collateral to which the Bank's security interest could attach.

In the case of *In re Samuels & Company, Inc.*, 526 F.2d 1238 (5th Cir.) *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976), the court, construing § 9.204(a) of the Code,[2] held that a defaulting buyer of cattle acquired rights in them sufficient for a security interest to attach under an after-acquired property clause in a security agreement, even though the cattle were purchased with a check that was dishonored. In its thorough analysis, the court recognized that the debtor's interest upon delivery of the cattle was defined under the Code and that however "slight or tenuous or marginal" the interest, it was "necessarily great enough to permit attachment of the lien."

■ In the case at bar, Roden purchased the cattle in question with a check, the disposition of which is not shown, took possession of the cattle, and placed them in his feedlot. When this occurred, Mr. Roden's interest in the cattle was defined under the Code. Thus, Mr. Roden had rights in the collateral, *i. e.*, the 158 head of cattle, to which the security interest could attach under the agreement executed in conjunction with the $350,000 promissory note.

## II.

■ The summary judgment proof conclusively established that Mr. Roden was a farmer at all times pertinent to this case. This point is unchallenged. Thus, when the Bank's lien attached to the 158 head of cattle, it continued in the collateral notwithstanding the sale from Mr. Roden to Mrs. Fisher, unless the sale was authorized by the Bank in the security agreement or otherwise. *See* Tex.Bus. & Com.Code Ann. §§ 9.306(b), 9.307(a) (Vernon Supp. 1978–1979).

■ The security agreement provides that the debtor will not sell, lease, or otherwise transfer the collateral without the Bank's consent. Mrs. Fisher contends, however, that although the security agreement did not authorize the sale in question, the Bank has nevertheless impliedly waived its lien on the 158 head of cattle by a prior course of conduct in which it permitted Roden to sell other cattle subject to the lien without requiring its prior consent.

In support of her position, Mrs. Fisher relies on *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726 (1967). In *Thomas*, the New Mexico Supreme Court determined that Clovis National Bank waived its lien in certain collateral by consenting to and acquiescing in the sale of collateral without requiring the debtor to obtain prior consent as required by the security agreement. This decision was made notwithstanding § 50A–1–205(4), N.M.S.A.1953, which provided:

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade ·and course of dealing controls usage of trade.

---

2.  This section provided:

(a) A security interest cannot attach until there is agreement (Subdivision (3) of Section 1.201) that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching.

Tex.Bus. & Com.Code Ann. § 9.204(a) (Vernon 1968).

This provision is identical to Tex.Bus. & Com.Code Ann. § 1.205(d) (Vernon 1968).

The Bank responds that Mrs. Fisher's contention is contrary to § 1.205(d) of the Code and advances the case of *Wabasso State Bank v. Caldwell Packing Co.*, 308 Minn. 349, 251 N.W.2d 321 (1976), in support of such an interpretation. In *Wabasso State Bank* the Minnesota Supreme Court determined that the bank did not waive its lien and impliedly authorize the sale of the collateral in question by virtue of a prior course of conduct whereby the bank failed to require its debtor to obtain permission to sell the collateral, as required by the security agreement. In so determining, the court stated:

'As we have pointed out the mere failure to rebuke the seller, the reasonable acceptance of the proceeds of the sale when actually delivered to apply upon the debt, are not acts which indicate intention to waive a security interest, but in the event such unreasonable act is inconsistent and contradictory of the express agreement, then the express terms control both the course of dealing and the usage of trade between the parties. The action of the lender and the debtor and their course of dealings between themselves is reasonable and is consistent with the underlying policy of the code and the provision prohibiting waiver of the security interest unless expressed in writing.'

*Wabasso State Bank v. Caldwell Packing Co., supra*, at 324–25, *quoting Garden City Production Credit Ass'n v. Lannan*, 186 Neb. 668, 186 N.W.2d 99, 103 (1971). *See also Baker Production Credit Ass'n v. Long Creek Meat Co., Inc.*, 266 Or. 643, 513 P.2d 1129 (1973); *Vermilion County Production Credit Ass'n v. Izzard*, 111 Ill.App.2d 190, 249 N.E.2d 352 (1969); *Colorado Bank & Trust Co. v. Western Slope Investments, Inc.*, 539 P.2d 501 (Colo.App.1975).

We are of the opinion, in light of the specific enactment by our legislature of § 1.205(d) and the provisions giving the financing of farm products preferred treatment, that the reasoning of *Wabasso State Bank* effectuates this legislative policy.

We further note that the New Mexico Legislature, by enactment of N.Mex.Stat.Ann. 50A–1–205(3), (4) (1975), set aside the *Thomas* rule. Under these circumstances, we respectfully decline the invitation to follow *Clovis National Bank v. Thomas, supra.*

We are also persuaded that Mrs. Fisher failed to establish a genuine question of fact on all of the essential elements of her affirmative defense of waiver. Where a plaintiff moves for summary judgment in an action in which defendant has pleaded an affirmative defense, the plaintiff is entitled to the summary judgment if he demonstrates by evidence that there is no material factual issue upon the elements of his claim and defendant fails to come forward with a showing that there is a disputed fact issue upon the affirmative defense. *Gulf, Colorado & Santa Fe Railway Co. v. McBride*, 159 Tex. 442, 322 S.W.2d 492, 500 (1958).

■ Waiver is commonly defined as the intentional release, relinquishment, or surrender of a known right. *Ford v. Culbertson*, 158 Tex. 124, 308 S.W.2d 855, 865 (1958). In *Nixon Construction Co. v. Downs*, 441 S.W.2d 284, 286 (Tex.Civ.App.—Houston [1st Dist.] 1969, no writ), the court stated:

'A waiver, involving as it does the idea of intention, may be express or implied. Waiver may be shown by such conduct as will warrant the inference of the relinquishment of a known right. But waiver by implication will be applied only to prevent fraud or inequitable consequences. To establish an implied waiver of a legal right, there must be a clear, unequivocal, and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part. In the absence of an express renunciation a waiver will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, *unless by his conduct the opposite party has been misled to his prejudice into the honest belief that such waiver was intended or consented to*' (emphasis ours). 60 Tex.Jur.2d 191–192, Waiver, § 9.

In essence, conduct which misleads no one does not constitute a waiver. *See Hines v. Jordan*, 228 S.W. 633, 634 (Tex.Civ.App.— Texarkana 1921, writ ref'd).[3]

The summary judgment proof fails to demonstrate that Mrs. Fisher was prejudicially misled by the Bank's conduct into believing that the Bank intended to waive its lien on the cattle in question. The proof also fails to show whether the Bank had actual or constructive knowledge of the transaction between Mr. Roden and Mrs. Fisher. Nor does the proof show whether Mrs. Fisher had knowledge of, or made any inquiry concerning, the existence of the Bank's lien on the cattle in question, although it was shown that Mrs. Fisher was a person experienced in cattle buying and their financing.

Mrs. Fisher contends that the most persuasive proof of waiver is the following testimony of Mr. Haulby Dean, vice president of the Bank:

Q You did not claim a lien on those ins and outs, turn arounds?

A No, no quick turn arounds.

Q Would that be true with any operation where he [Jimmy Roden] might take delivery and might sell them in a matter of days, without putting them out on the place?

A I think these particular cattle in question, I don't think the bank paid for those cattle.

This testimony refers to quick turn around sales of cattle whereby Roden bought cattle at auctions and sold them without bringing them to his feeding and grazing operation. In the case at bar, the 158 head of cattle were purchased from Hatcher in August 1976, delivered to Roden's feedlot, sold to Mrs. Fisher, and remained in Roden's possession until shortly before this action commenced. There is no evidence of probative force which would support the contention that the transaction in question was a quick turn around not intended to be covered under the security agreement.

We conclude that the summary judgment proof conclusively establishes that Roden defaulted on a promissory note to the Bank; that the note was secured by an agreement for value in which a security interest was created in named collateral and after-acquired collateral of a similar nature; that Roden had rights in the collateral, i. e., 158 head of cattle, to which the security agreement attached; and that the Bank was entitled to the proceeds from the agreed sale of the cattle by virtue of its security interest. The proof fails to raise a genuine issue of fact on all of the essential elements of Mrs. Fisher's affirmative defense of waiver. Therefore, the Bank was entitled to summary judgment. *See Gulf, Colorado & Santa Fe Railway Co. v. McBride, supra*.

### III.

In her final point of error, Mrs. Fisher contends that the trial court erred in severing this cause of action from the Bank's cause of action against Mr. Roden and others claiming an interest in the collateral. We disagree.

A trial court is vested with broad discretion in determining whether to sever a cause of action. The trial court's action in this regard will not be disturbed upon appeal unless it has abused its discretion. Tex.R.Civ.P. 41; *Womack v. Berry*, 156 Tex. 44, 291 S.W.2d 677, 682 (1956); *Sheppard v. Citizens National Bank of Austin*, 567 S.W.2d 613, 615 (Tex.Civ.App.—Austin 1978, writ ref'd n.r.e.). In *Marshall v. Garcia*, 514 S.W.2d 513, 517 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.), the court said:

> Rule 166–A, Subsection (d) clearly authorizes the trial court to grant summary judgment as to parties or issues not in controversy. The trial court should, if possible, enter a severance of that phase of the case. A summary judgment which does not dispose of all parties and all

---

3. In this case, the court said: " 'Waiver' is an intentional abandonment of a known right. 'There can be no waiver unless so intended by one party and so understood by the other party, or one party has so acted as to mislead the other and is estopped thereby.' "

issues in a pending suit is interlocutory in nature. . . .

The trial court's judgment severing this cause of action inures to the benefit of Mrs. Fisher. Under the circumstances, we conclude that the court did not abuse its discretion in granting the severance.

In summary, Mrs. Fisher's points of error are overruled. Accordingly, the judgment of the trial court is affirmed.

COUNTISS, J., not participating.