ANON, INC. (formerly known as M & R Livestock Co., Inc.), Defendant-Appellant,

v.

FARMERS PRODUCTION CREDIT ASSOCIATION OF SCOTTSBURG, Plaintiff-Appellee,

Benny L. Flynn, Shirley Y. Flynn, Defendants-Appellees.

No. 1–682A148A.

Court of Appeals of Indiana, First District.

March 29, 1983.

Rehearing Denied April 20, 1983.

Thomas L. Mattix, S. Gregory Zubek, Kunz & Kunz, Indianapolis, for defendant-appellant.

Steven K. Robison, Montgomery, Elsner & Pardieck, Seymour, for plaintiff-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendant-appellant Anon, Inc. (formerly known as M & R Livestock Co., Inc.) (Anon) appeals from an adverse judgment for conversion of hogs in a suit brought by plaintiff-appellee Farmers Production Credit Association of Scottsburg (FPCA), a creditor owning a security interest in the hogs. Anon claims that FPCA lost its security interest in the hogs by giving the debtor authority to sell them in his own name.

We reverse.

## STATEMENT OF THE FACTS

Much of the evidence is uncontroverted. The trial court made findings of fact and conclusions of law upon which it based its judgment. The evidence shows that FPCA financed Benny L. and Shirley Y. Flynn's (Flynns) hog production enterprise and took a valid security agreement on the hogs. The agreement was perfected by filing in the Recorder's Office in Lawrence County on March 28, 1979. The agreement contained the usual prohibition against the sale of hogs by Flynns without FPCA's prior written permission, and a provision that the security interest attached to the proceeds of any sale.

Between October 1979, and October 1980, Flynns sold shipments of the secured hogs to Anon on ten occasions without disclosing the security interest. Anon, located near Logootee, Martin County, did not investigate the recording. The checks were issued to Benny Flynn alone as payee and contained a stamped certification which the payee endorsed by which the payee guaranteed that he was the unconditional owner of the hogs and there were no liens. Some checks were endorsed by Flynn to FPCA for application on the loan, and other payments traceable to the ten transactions were made to FPCA by Flynn by his own check. However, payments totaling $12,-430.33 were kept by Flynns and never reported. The trial court found that Anon had constructive knowledge of the security interest of FPCA, but there is no contention that it had actual knowledge at the time of the purchases.

In findings 14, 15, 16, 17, 18, 19 and 20, the trial court found that at no time did FPCA give written consent to Flynns to sell hogs, and none of the sales was authorized by FPCA. The court found that any consent or authorization given by FPCA to Flynns to sell hogs was conditioned upon Flynns' applying the proceeds to the debt, and that any sale from which the proceeds were not applied was not authorized. The court also found that FPCA did not intend to waive its security interest in the hogs or the proceeds therefrom and did not impliedly waive the security interest by the manner in which it did business. It found that FPCA had no knowledge of the sales until after they were completed.

The issue at trial and on appeal is whether legal authorization to sell hogs was given Flynns by FPCA in a manner other than written authorization. The managing officer of FPCA, Jerry Lambreck, testified to the course of dealing between FPCA and Flynns, as well as dealings with other members of FPCA. He expected the hogs to be sold by Flynns and had no objection. He knew of a number of sales by Flynn in his own name and knew of the false endorsement which guaranteed the hogs to be lien free. He never rebuked or criticized Flynn, or otherwise policed FPCA's collateral. On this point his testimony is revealing. On direct examination he stated:

"Q. What was said, if anything, at that time regarding the sale of the feeder pigs?

A. O.K. It was our policy when we loaned money to a member to purchase feeder pigs, that when they were finished and sold they were to bring the money to Production Credit and pay the loan. We'd set up money for feed and hogs. We expected the full proceeds."

On cross-examination that area of inquiry was pursued further.

"Q. O.K. So when you and Benny [Flynn]—did you at the time of the

March 13, 79—you sat down with Benny and discussed the operation, the hog operation he was going to operate didn't you?

A. Right.

\* \* \* \* \* \*

Q. O.K. So there was no doubt in your mind that Benny was going to sell hogs?

A. That's right.

\* \* \* \* \* \*

Q. Now in your security agreement and financing statement there is a section, I believe it is section # 6, that states that Benny is not supposed to sell any livestock that is pledged under that particular agreement without the prior written consent of PCA. Is that correct?

A. Yes.

\* \* \* \* \* \*

Q. Did you ever require Benny Flynn to—during the course of this particular loan that we are talking about ... did you require Benny Flynn to get your prior written consent to make a sale of hogs?

A. No.

Q. You never did?

A. No.

Q. Even in spite of what your agreement said you didn't feel that was necessary?

A. O.K. We normally trusted our members to do this and did not.

Q. OK. So you trusted Benny Flynn as you stated. He could go out and sell his hogs whenever he wanted but you expected him to bring the proceeds in to you.

A. That's correct.

\* \* \* \* \* \*

Q. Once again to sum up your, what I understand your testimony to be, you were aware that Benny was selling hogs and you in fact wanted him to sell hogs. You just expected him and trusted him to come in and bring you the proceeds. Is that correct.

A. That's correct."

He further testified that FPCA did not intend to forgo its liens because of the above practice.

The trial court found that Anon by purchasing the hogs did not take them free of the lien and conversion occurred, and entered judgment accordingly.

### ISSUES

Anon presents the following issues:

I. Whether FPCA, by its statements or actions, authorized Benny Flynn to sell the collateral; and

II. Whether such authorization, if given, cut off FPCA's security interest under Ind.Code 26–1–9–306(2).

### DISCUSSION AND DECISION

Anon challenges the trial court's judgment on the grounds that: (1) FPCA gave express authorization to sell, (2) FPCA expressly waived the written permission requirement, (3) authorization to sell could not be revoked after the sale based on Flynns' failure to fulfill the "condition" of remitting the proceeds, (4) FPCA is estopped from claiming a security interest, and (5) authority to sell may be implied from Flynns and FPCA's course of dealing.

FPCA defends the judgment by contending: (1) Indiana recognizes an action for conversion against a buyer of goods which are subject to a valid security agreement, (2) a course of dealing cannot be used to contradict a blanket prohibition against sale by the debtor without the written consent of the secured party, (3) consent by a secured party can be made conditional on the debtor's remittance of the proceeds to the secured party, and (4) the conduct of FPCA was not a waiver.

These arguments are interrelated, and we will discuss them together. No Indiana case has been found that is dispositive of the question raised.

Ind.Code 26–1–9–307(1) of the UCC provides that:

"A buyer in ordinary course of business ... *other than a person buying farm products from a person engaged in farming operations* takes free of a security interest created by his seller . . . ." (Emphasis added.)

Ind.Code 26–1–9–306(2) provides:

"Except where this Article [chapter] otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

■ The parties concede that a cause of action for conversion lies for the purchase of property in which a perfected security interest exists. The parties concede that no written authorization to sell was given Flynn by FPCA, and that Flynns were engaged in a farming operation.

■ No basis exists in the case at bar for the application of the doctrine of estoppel because there was no detrimental reliance due to Anon's lack of knowledge of the FPCA's conduct. *North Central Kansas Production Credit Association v. Washington Sales Company, Inc.,* (1978) 223 Kan. 689, 577 P.2d 35; *Clovis National Bank v. Thomas,* (1967) 77 N.M. 554, 425 P.2d 726; *Wabasso State Bank v. Caldwell Packing Company,* (1976) 308 Minn. 349, 251 N.W.2d 321; *Community Bank v. Jones,* (1977) 278 Or. 647, 566 P.2d 470.

■ As indicated by Ind.Code 26–1–9–306(2), where a sale of the collateral has been authorized unconditionally either in the instrument or otherwise, the security interest does not survive the sale. *Baker Production Credit Association v. Long Creek Meat Company, Inc.,* (1973) 266 Or. 643, 513 P.2d 1129; *Farmers State Bank, Aurora v. Edison Non-Stock Cooperative Assn.,* (1973) 190 Neb. 789, 212 N.W.2d 625; *Lisbon Bank and Trust Company v. Murray,* (1973) Iowa, 206 N.W.2d 96. Where a secured party gives express consent and au-

thority to a debtor to sell contrary to the terms of a security agreement, the security interest is cut off. In *North Central Kansas, supra,* the court found express authorization to sell where the secured party told the debtor he could sell the collateral in his own name provided he applied the proceeds on the debt. The security agreement forbade sale without written consent, but permitted sale if payment was made jointly to the debtor and the secured party. A like result was reached in *The First National Bank and Trust Company of Oklahoma City v. Iowa Beef Processors, Inc.,* (10th Cir. 1980) 626 F.2d 764. In the latter case the secured party admitted that the debtor had a standing consent to sell cattle, conditioned on the prompt remitting of the proceeds to the secured party. The court found that the express authorization effectively released the lien.

■ It appears that there is no question that terms and conditions in security agreements can be expressly waived. Ind.Code 26–1–1–103 provides:

"Unless displaced by the particular provisions of this Act, [26–1–1–101—26–1–10–106], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

Most cases, including those cited by FPCA, recognize that the lien under the security agreement, or the right of prior consent to sell, can be expressly waived. *See Wabasso, supra; Lisbon Bank, supra; North Central Kansas, supra.* Waiver has been characterized as a "voluntary abandonment or surrender, by a capable person of a right known to him to exist with the intent that such a right shall be surrendered and such person forever deprived of its benefit." *North Central Kansas, supra; Farmers State Bank, Aurora, supra; Garden City Production Credit Assn. v. Lannan,* (1971) 186 Neb. 668, 186 N.W.2d 99. *Community Bank v. Jones,* (1977) 278 Or. 647, 566 P.2d 470, noted that equitable principles are pre-

served by the U.C.C. Where an express waiver exists, it need not be communicated to the buyer. *Lisbon Bank, supra.*

Much controversy surrounds implied waiver of security interests, implied waiver of the requirement of prior written permission to sell, and implied waiver inferred from a course of dealing or usage of trade. Ind.Code 26–1–1–205(4) provides:

"The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."

Ind.Code 26–1–2–209(4) provides:

"Although an attempt at modification or recission does not satisfy the requirements of subsection (2) or (3) [a writing must be modified in writing] it can operate as a waiver."

Ind.Code 26–1–2–209(4) above, coupled with Ind.Code 26–1–1–103, above, forms the basis of cases which hold that certain conduct, course of dealings, or usage of trade and the like may create a waiver of the conditions in a security agreement or a waiver of the security interest itself. *Wabasso State Bank, supra,* recounts the deep cleavage existing between jurisdictions on the subject.

"One of the purposes of the Uniform Commercial Code is 'to make uniform the law among the various jurisdictions.' Minn.St. 336.1—102(2)(c). However, when we look to those jurisdictions which have faced this issue we find that the decisions are evenly divided. The position adopted by the court below finds support in *Clovis Nat. Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726 (1967); *Planters Production Credit Assn. v. Bowles,* 256 Ark. 1063, 511 S.W.2d 645 (1974); *Lisbon Bank & Trust Co. v. Murray,* 206 N.W.2d 96 (Iowa 1973); *Hedrick Sav. Bank v. Myers,* 229 N.W.2d 252 (Iowa 1975); *Central Washington Production Credit Assn. v. Baker,* 11 Wash.App. 17, 521 P.2d 226 (1974); *In re Cadwell, Mar-*

*tin Meat Co.,* 10 U.C.C.Rep. 710 (E.D.Cal. 1970); and *United States v. Central Livestock Assn. Inc.,* 349 F.Supp. 1033 (D.N.D. 1972).

The position of appellant that Minn.St. 336.1—205(4) prohibits implied authority where the security agreement requires written authority finds support in *Garden City Production Credit Assn. v. Lannan,* 186 Neb. 668, 186 N.W.2d 99 (1971); *Baker Production Credit Assn. v. Long Creek Meat Co.,* 266 Or. 643, 513 P.2d 1129 (1973); *Vermilion County Production Credit Assn. v. Izzard,* 111 Ill.App.2d 190, 249 N.E.2d 352 (1969); *The Colorado Bank & Trust Co. v. Western Slope Investments, Inc.* [36 Colo.App. 149], 539 P.2d 501 (Colo.App.1975); and *United States v. E.W. Savage & Son, Inc.,* 343 F.Supp. 123 (D.S.D.1972), affirmed, 475 F.2d 305 (8 Cir.1973). We also note the case of *The Burlington Nat. Bank v. Strauss,* 50 Wis.2d 270, 184 N.W.2d 122 (1971). In 1968 New Mexico by statute set aside the Clovis rule. N.Mex.Stat. Ann. 50A–1–205(3, 4) (1975 Supp.)."

251 N.W.2d at 323. Additional cases prohibiting or limiting implied authority or waiver are *North Central Kansas, supra; Farmers State Bank, Aurora, supra; Fisher v. First National Bank of Memphis,* (1979) Tex.Civ.App., 584 S.W.2d 515; *The Community Bank, supra.*

The cases supporting the waiver theory advance various rationales. Some cases, in reference to Ind.Code 26–1–1–103, 2–209(4) and 9–306(2), of the UCC, hold that by common practice in the trade and by custom and usage, the secured party has acquiesced in and consents to the sale, and has thereby waived its security interest. *See Clovis National Bank, supra; Lisbon Bank, supra.* In such cases the courts have reasoned that the secured party is in a much better position to protect itself than the buyer because he knows of the debtor and the origin of the product. The buyer, sometimes at remote distances, does not have this knowledge. Therefore, the loss is cast upon the secured party. Attacks have been made on the farm produce exception, found

under Ind.Code 26–1–9–307(1). In *Lannan, supra,* the dissent, after asserting that the holding by the majority placed an unwarranted responsibility on commission merchants and public markets, vividly proclaimed that such exception permitted the creditor to follow "the steak or meat to the customer's plate."

The cases on the other end of the spectrum would prohibit alteration or waiver of the written security agreement by implication arising out of the subsequent conduct of the parties. *See Fisher, supra; Lannan, supra; Wabasso, supra.* They state that the fundamental object of Article 9 of the UCC is to provide a legal framework within which secured transactions can be effected cheaply, openly and safely, and to furnish acceptable and suitable standards which promote fluidity in farm credit. *See Lannan, supra.* At the same time Article 9 facilitates the sale of the collateral by furnishing a definable and ascertainable standard upon which the purchaser can rely. The cases state that when an agreement is clear on its face, a court should hesitate to infer a waiver by conduct of the parties and should do so only to prevent fraud. *See also Community Bank, supra.* Ind.Code 26–1–1–205(4), they assert, can be used only to interpret instruments, not contradict them. The buyer, having constructive notice of the security agreement, can inform himself of its existence and then take steps to protect himself by requesting a copy of the consent or putting both names on the draft. The cases contend the mere fact that the secured party learns of the debtor's sales when the proceeds are remitted provides no basis for a waiver, because the secured party is confronted by an accomplished fact.

It is generally held that where conditions to a sale are imposed by the secured party, a sale by the debtor in violation of the conditions is unauthorized, and the security interest continues. *North Central Kansas, supra; Baker Production, supra; Lisbon Bank, supra; Farmers State Bank, Aurora, supra; First National Bank and Trust, supra.* This latter case contains a comprehensive and, we believe, proper reso-

lution to the case at bar. There, the security agreement contained no reference to sales and, therefore, no authorization for sales. Since under 9–306(2) authorization can be given "in the security agreement or otherwise," the court looked beyond the written agreement. The secured party never asserted any right to require written consent and admitted that the debtor had standing authority to sell the cattle upon the condition that he promptly remit the proceeds to the secured party for application on the debt. Based on the validity of this conditional authorization, the secured party claimed it could follow the collateral into the hands of the buyer upon the failure of the debtor to remit. The court in *First National Bank and Trust* observed that other courts have approved the validity of certain conditions that tend to facilitate the sale of cattle and yet protect the secured party, such as: (1) that payment be made to the buyer and secured party jointly, (2) that the buyer's drafts are honored and paid, and (3) that no prior default has occurred. The court noted that these are conditions precedent, ascertainable by the purchaser prior to the consummation of the sale; they are matters that the buyer, by checking the record and calling the secured party, could control. Some courts, it continued, have held that when consent is conditional upon the debtor's agreement to remit, the consent is effective to release the lien on the collateral sold even though the secured party never receives the proceeds. As authority, the *First National Bank and Trust* court cites: *Lisbon Bank, supra; See also United States v. Hansen,* (8th Cir.1963) 311 F.2d 477, 480 (applying Iowa law); *North Central Kansas, supra; Baker Production, supra.*

In *First National Bank and Trust,* the court quoted *Lisbon Bank, supra,* as follows:

"'In the present case there is substantial evidence from which the trier of fact could find the bank gave general authority to Glenn Meier [the debtor] to sell collateral subject to his duty to account for the proceeds. The bank acknowl-

edges no complaint would have been made here had the proceeds been applied against the note. The bank lost because it trusted Glenn Meier to do what he had done before when he sold collateral. Murray [the buyer] trusted his assurance the sale was free of lien. As between the bank and Murray, the law imposes the risk of loss in these circumstances on the bank.' "

626 F.2d at 768.

The *First National Bank and Trust* court held that in such instances the failure of the buyer to check the records is irrelevant because the secured party gave the debtor actual authority to sell, and it was, therefore, not necessary that such authority be communicated to the purchaser. The court opined that even if the buyer had checked with the secured party, the latter would presumably have told the buyer that the debtor had authority to sell in his own name. The buyer could not know at the time of the sale that the debtor would not remit. Therefore, the court concluded that a consent given a debtor by the secured party to sell in his own name "provided" debtor remits is not a true conditional sales authorization. In essence such condition makes the buyer an insurer of acts beyond his control and is unfair to a good faith purchaser. Finally, the court stated, "We conclude that the policy of the Uniform Commercial Code to promote ready exchange in the marketplace . . . outweighs the secured party's interest in the collateral under these circumstances." (Citations omitted.) *Id.* at 769.

Applying the above authority to the facts of this case, we conclude that neither estoppel nor implied waiver is involved here. We are of the opinion that the testimony of FPCA's managing officer, Jerry Lambreck, conclusively demonstrates that the FPCA expressly waived the prior written authority requirement in the security agreement and gave Flynns standing authority to sell hogs in their own name upon the condition that Flynns remitted the proceeds. In view of the testimony quoted in the statement of the facts, the trial court's findings and conclusions that none of the sales was authorized are untenable. When FPCA consented to the sales on the condition that Flynns remit, it knowingly and intentionally renounced a known right, that is, the right to require prior written consent for each sale. We adopt the result and rationale of *First National Bank and Trust*. Here, as in that case, if Anon had asked Lambreck about the sale, he presumably would have told Anon that he had given Flynn standing authority to sell. Anon's failure to examine the records is irrelevant because actual authority existed. It was FPCA, not Anon, who gave Flynn free reign over the sale of the collateral. When Flynn abused this power, the loss should have fallen on the party who could have prevented it, FPCA.

Anon raises the question of the trial court's entering the judgment in the name "M & R Livestock Co., Inc. (Anon, Inc.)" It desires that the record be ordered amended to show the judgment in the name of "Anon, Inc.", the name the corporation possessed at the time of judgment. This request is ordered granted.

For the above reasons this cause is reversed, and the trial court is ordered to enter judgment for Anon, Inc.

Reversed.

ROBERTSON, P.J., and RATLIFF, J., concur.