In re Estate of Wig Harding.

Minnie Brunt, Appellant, v. Iantha M. Harding et al., Appellees; Anna McCaffrey et al., Appellants, v. Iantha M. Harding et al., Appellees.

No. 46534.

December 12, 1944.

H. S. Life, of Oskaloosa, for appellants.

Wilbur Dull, Bailey C. Webber, and C. J. Lambert, all of Ottumwa, for appellees.

MILLER, J.—On June 9, 1942, the will of Wig Harding, deceased, was admitted to probate. It made certain specific bequests to two granddaughters and to two stepsons, with the residue of the estate to be divided among the widow and three sons of testator. Minnie Brunt filed a claim against the estate based on a note dated July 10, 1941, for $2,500. Carl McCaffrey filed a claim for $686, as the balance due on three notes, one dated October 1, 1941, for $396.30, one dated December 20, 1941, for $120, and the third dated March 1, 1937, for $2,000. Anna McCaffrey filed a claim based on a note dated March 15, 1937, for $1,000. The executors recommended that the claim of Carl McCaffrey be allowed for $686 and interest and that of Anna McCaffrey be allowed for $1,000 and interest and an order was entered so allowing said claims. The claim of Minnie Brunt was also allowed for $2,446.74 with interest.

The widow elected to take her distributive share. She filed an application which asserted that decedent had two policies of life insurance, payable to his estate, one for $4,000, on which the balance due, less a loan, was $3,288.17, and the other for $2,500, and that, under sections 8776 and 11919 of the Code, 1939, the proceeds of the policies are not subject to decedent's debts. The prayer was that she be paid her distributive share of the proceeds of the policies free from the debts of the estate. Anna McCaffrey, Carl McCaffrey, and Minnie Brunt filed resistances to the widow's application, asserting that decedent had agreed that the notes made to them would be paid from the proceeds of his life insurance. The court determined that the widow's application should be granted as to all persons interested in the estate except the claimants above named, as to whom the order was without prejudice. On April 12, 1943, the proceeds of the insurance, amounting to $5,790.71, were ordered deposited with the clerk of court. On July 15, 1943, the final report of the executor was approved with jurisdiction retained only for the purpose of distribution of the proceeds of life insurance disclaimed by the executor as an asset of the estate. Thereafter certain legatees under the will filed a petition of intervention which sought an adjudication of the insurance money. Claimants filed resistance thereto and also filed answers

thereto. A stipulation of partial settlement between the widow and the claimants was filed, which provided that the widow's interest in the insurance proceeds amounted to $1,930.24 and was to be distributed as follows: Minnie Brunt, $357.14; Anna and Carl McCaffrey, $142.86; Mrs. Harding, the widow, $1,430.24. Order of court was entered pursuant thereto and claimants' resistances to the withdrawal of such funds by the widow were withdrawn with prejudice.

In the meantime, the claimants Anna and Carl McCaffrey had commenced an action in equity to establish a lien on the insurance proceeds for the payment of their claims, asserting that at the time plaintiffs loaned Wig Harding the sums evidenced by their notes Harding agreed to make the loans secure by making the same, in the event of his death prior to the payment thereof, payable out of the proceeds of certain life-insurance policies carried upon his life and to direct the payment of said loans by his executors or administrators out of the proceeds of said policies; that he failed so to do, the loans are unpaid, and the agreements constitute an equitable lien upon all proceeds of life insurance payable to the estate of Wig Harding. Minnie Brunt also filed a petition in equity which asserted that she loaned Wig Harding $2,500 on July 10, 1941, and to get said loan Harding agreed to make a will providing for the payment of the loan out of any proceeds of life insurance payable to his estate, and agreed that if the loan was unpaid at the time of his death it should be paid out of the proceeds of life insurance payable to his estate; that Harding failed to make such a will or to take any action in fulfillment of said agreement; that the agreement constituted a prior equitable lien on the proceeds of life insurance payable to his estate, to the exclusion of Harding's wife and children, under section 8776 of the Code of Iowa. The answers were in the nature of general denials. Specific defenses asserted in addition to the general denials need not be considered by us.

Pursuant to stipulation of counsel, the two actions in equity were consolidated with the matter of the estate of Wig Harding for trial as a probate matter to a jury as to the disposition of the insurance proceeds remaining in the hands of the clerk. At

the close of the evidence the court directed a verdict in favor of the estate. The claimants have appealed to this court.

One of the policies of life insurance was issued by the Bankers Life Company in the sum of $4,000 on January 22, 1927, with decedent's. wife as beneficiary. On September 7, 1928, the designation of beneficiary was changed to decedent's estate. The other policy was issued by the Equitable Life Insurance Company on July 21, 1932, for $2,500, payable to the executors, administrators, or assigns of the insured.

Claimant Minnie Brunt testified:

"I am a niece of Wig Harding and have been acquainted with him practically all of my life. Subsequent to March 1, 1937, I had numerous conversations with Wig Harding relative to his business relations with persons other than myself. I had such a conversation with him on July 10, 1941, and also since that date. I remember what he said to me on that date relative to transactions with persons other than myself. * * * In the lumber yard office. * * * Well I was there on a business mission of my own and we talked business * * * and he told me that he had these debts to pay, and he says—with the McCaffreys. Now he didn't say Carl or Anna separately; he says McCaffreys. * * * And he says, I have made an agreement and arrangements that if I don't get their debt paid while I am here on earth that I will pay it out of my insurance, which he was carrying."

Claude Howerton testified:

"I overheard a conversation between Wig Harding and other persons concerning life insurance during 1938. * * * Q. State to the jury what you heard Mr. Wig Harding say to Paul Mathews with regard to his insurance. * * * A. Well, he said he thought he would have enough insurance to take care of all he owed."

Walter Welch testified:

"I was well acquainted with Wig Harding for many years. * * * I had a conversation with him during the last year of his life. I remember what he said to me. * * * He told me that he had insurance enough to cover his indebtedness."

Paul Mathews testified:

"I was acquainted with Wig Harding prior to his death and have had conversations with him in regard to his debts and obligations he owed to various people. The last of these conversations was about eight months prior to his death and extended back to about two years from the date of his death. I remember substantially what Mr. Harding said to me. * * * he stated that he had insurance enough to take care of all of his obligations."

Will Walters testified:

"I was acquainted with Wig Harding during his lifetime. I had a conversation with him in September or October, 1941. * * * I went in for sand * * * He says, you know that I owe Minnie? and I says, yes. He says, I am going to pay her every dollar I owe her, and I have arranged and agreed to pay with my insurance."

Anna McCaffrey testified:

"I am the wife of Carl McCaffrey * * * I was acquainted with Wig Harding during his lifetime and knew him practically all of my life. Within the last two or three years prior to his death, I had conversations with him in regard to matters other than personal matters between he and I. * * * One of them was in September, 1941. * * * Well, I was at his office and he remarked to me about Minnie Brunt being worried about the debt he owed her. And he said she had no reason to worry, that when she renewed the note that she renewed it on the strength of that insurance policy which he expected her to be paid out of. * * * He said that if he did not get his debt paid before his death that it was to be paid out of this insurance. * * * Well, he said that he had made an arrangement with her. Q. With who? A. With Minnie Brunt. Q. To what effect? A. To have this—or this note paid out of this insurance policy if he did not get it paid before his death."

Carl McCaffrey testified:

"I was acquainted with Wig Harding during his lifetime.

I had conversations with him subsequent to July 10, 1941 * * *
Q. Now what did he say about his business, if anything, with Minnie Brunt? A. He says, I have arranged and made an agreement if I should die before I get her debt paid off that I have got insurance money to pay it afterwards, after my death; I have got it fixed in that way.''

J. E. King testified:

''I am president of the Peoples National Bank of Albia, Iowa, and was acquainted with Wig Harding during his lifetime. He has borrowed money from our bank. He came to our bank to obtain a loan in about the year 1938; it may have been a year earlier or a year later. He had a conversation with me in my office in the bank at that time. Mr. Wig Harding, his son William Wallace Harding, and myself were present. I took a financial statement from Mr. Harding on that occasion; he told me of his assets and liabilities; he said he had a life insurance policy, in fact he showed me the policies and I examined them. * * * and particularly, I looked at the fact that they were assigned—they were made payable to his estate. * * * He told me the policies were made to his estate and that the proceeds, if anything happened to him, would go to pay his debts. * * * January 17, 1939, I took a financial statement from Mr. Harding at that time. * *. * Wig Harding exhibited his life insurance policies to me at that time. * * * He called attention to the fact that they were made payable to his estate. Q. And what did he say about it? A. He said they were—being payable to the estate, they were to be used to pay his debts.''

Ida Mae Mintonye testified:

''Wig Harding was my uncle and I was acquainted with him. Two or three years prior to his death I had a conversation with him concerning the life insurance which he carried. * * * The conversation concerned the obligation which he owed to Mrs. Brunt. This conversation occurred three years ago this month; it related to debts he owed to various people. * * * He said that he had his insurance for that purpose. Q. What purpose? A. To pay all his debts. Q. You had another conversation later did you? A. Yes. Q. That was shortly before he

died was it? A. Three days. Q. Where was that? A. It was in his home. Q. Did you at that time not only have conversation with him there but did you observe what he did at that time? A. I did. * * * Well, he was writing on a piece of paper. He took a piece of paper and started to make figures on it writing on it. I can recall three names that he wrote down, or he said he wrote down. I watched him write. * * * He called the name of the McCaffreys, Minnie Brunt * * * Q. What McCaffreys? A. Well, he just said McCaffreys. Q. Go ahead. A. And Minnie Brunt and Will Powell. Q. What did he say about them? A. He said that he wanted them people paid, that he was carrying insurance to pay those people and to pay all his creditors.''

Defendants' motion for a directed verdict at the close of the evidence asserted nine grounds, of which the second, third and ninth were as follows: 2. There is no competent evidence of any such contract, assignment, special arrangement, special contract or agreement because (a) there is no evidence of a meeting of minds of the contracting parties (b) no consideration for decedent's promises (c) no evidence of the character of the contract or arrangement, its nature, scope, debts affected, proceeds of policies affected, or time of making the contract (d) no showing that the creditors knew of the arrangement or contract or relied thereon; 3. the evidence merely shows that decedent believed that his insurance was sufficient to pay his debts, believed that he had an arrangement so that it would pay his debts or some of them, and constitutes admissions against interest only and does not affirmatively establish the contract, assignment, or arrangement sufficient to meet the requirements of sections 11919 and 8776, Code, 1939; 9. should the court submit the case to the jury and the jury return a verdict for claimants it would be the duty of the court to set the same aside because not sustained by sufficient evidence to meet the law's requirement of clear, satisfactory, and convincing proof. The court sustained the foregoing grounds of the motion. The two equity actions were dismissed and the costs were taxed against the plaintiffs and claimants.

This case involves an interpretation of section 8776, Code, 1939, which provides as follows:

"A policy of insurance on the life of an individual, in the absence of an agreement or assignment to the contrary, shall inure to the separate use of the husband or wife and children of said individual, independently of his creditors."

Appellants rely upon our recent pronouncement in the case of In re Estate of Paul, 231 Iowa 1078, 3 N. W. 2d 186. The opinion in that case reviews and quotes from our prior pronouncements in the cases of In re Estate of Donaldson, 126 Iowa 174, 177, 101 N. W. 870, 871; Jacobson v. New York L. Ins. Co., 199 Iowa 770, 772, 202 N. W. 578, 579; Aetna L. Ins. Co. v. Morlan, 221 Iowa 110, 117, 120, 264 N. W. 58, 61, 62; In re Estate of Hazeldine, 225 Iowa 369, 380, 280 N. W. 568, 570.

In the Paul case we pointed out that in the Donaldson case, supra, 126 Iowa 174, 101 N. W. 870, the deceased supposed that if his insurance was payable to his estate it could be reached by his creditors, but it was held that his promise to take out the insurance in such belief did not constitute a special contract or arrangement to pay the specific debt from the avails of the insurance policy, nothing more than an equitable assignment of a part of the proceeds of the policy, whereas such cases require what is in fact an assignment, oral or written, of the fund, or some definite proportion thereof, such an agreement as that the assignor parts with all control thereover; a mere agreement to pay out of a part of a particular fund is not sufficient.

In the Jacobson case, supra, 199 Iowa 770, 771, 202 N. W. 578, 579, the insured delivered his policy of insurance to his mother stating, "This is for your protection. You keep up the premiums on it, and I will never change it." Later he married, secured the policy, without his mother's knowledge, and changed the beneficiary to his wife. We held that the mother was entitled to the proceeds; the transaction amounted to a contract that in consideration of the mother's paying the premiums the son would not exercise the right to change beneficiaries.

In the Morlan case, supra, 221 Iowa 110, 264 N. W. 58, the evidence established a contract by which the insured made Mrs. Dutton the beneficiary in his policy and, in consideration of her promise to furnish care and support for his parents, the policy was to stand as security for $4,700 previously spent, as well as

$500 advanced when she was made beneficiary and $1,000 loaned at a subsequent date. We held that Mrs. Dutton was named beneficiary for a valuable consideration before any interest accrued to Helen Morlan, and such rights were coupled with an interest so that thereafter the insured was without power to assign the policy or change the beneficiary therein.

In the Paul case, supra, 231 Iowa 1078, 3 N. W. 2d 186, the evidence showed that the insured, his doctor, funeral director, landlord, and his son all thought that the insurance policy was subject to his debts, but also that there was an agreement made that the policy should inure to the benefit of the doctor, landlord, and funeral director, as well as the son, and relying thereon the doctor furnished medical services, the landlord furnished board, room, and care, and the funeral director provided his services. We held that the agreement was supported by good consideration and was enforceable as against the son; the creditors having rendered their services in reliance upon the agreement, the insured was without power to destroy the protection he had afforded them.

In the Hazeldine case, supra, 225 Iowa 369, 280 N. W. 568, the decedent carried five policies of insurance, aggregating approximately $72,000. All were payable to his estate. His only heir was an illegitimate daughter, eight years old. Hazeldine had been married to Grace King and was later divorced from her. Grace's mother, Mary E. King, had loaned considerable money to Hazeldine. James S. Coburn filed a claim, as assignee of Mary E. King, which asserted that Hazeldine promised Mrs. King that if she would refrain from proceeding to enforce payment of the money he owed to her he would arrange to make the policies carried by him available to her as security, either by assignment or by making her the beneficiary thereof; that relying thereon she refrained from proceeding to enforce payment, and therefore the proceeds of the insurance inured to the claimant. The claim was allowed as a general claim for $75,879.57. The only question litigated was whether there was an agreement or assignment within the contemplation of section 8776 of the Code. The trial court found for the estate. In affirming the case this court reviewed the evidence at length and found

346

that it did not show a promise to make the insurance available to Mrs. King but only a false statement that that had been done. This court also was in doubt that there was sufficient consideration to support the alleged oral contract and held that the evidence was insufficient to establish the same.

From the foregoing it appears that in the Donaldson case we held that the mere supposition of the deceased that if his insurance was payable to his estate it could be reached by his creditors was insufficient to meet the requirements of the statute. (Section 8776, Code, 1939.) In the absence of a legal assignment of the insurance as security for the debt, the agreement has to be such that the assignor parts with all control thereover. In the Jacobson case and the Morlan case we held that each agreement was supported by adequate consideration and was such that the insured lost the right to change the beneficiary. In the Paul case there was no written assignment but we held that, under the rules announced in the Jacobson case and Morlan case, there was an equitable assignment, supported by adequate consideration, which the insured could not violate and which was enforceable against his estate. The Hazeldine case is in accord with such pronouncements.

▮ The record here is similar to that of the Donaldson case and the Hazeldine case. Here, as in the Donaldson case, the decedent thought that if his insurance was payable to his estate it could be reached by his creditors. We held that that was insufficient. We adhere to such holding. Here, as in the Hazeldine case, there is evidence that decedent stated that he had done that which he had not done. The evidence was held to be insufficient to comply with the statute. We adhere to such holding.

▮ In the Hazeldine case, supra, we held that the statute "must be liberally construed in protecting the interests of those for whose benefit" it was enacted. We adhere to such holding. The rule thus far developed that, to comply with the statute, in the absence of a legal assignment of the insurance the contract must create an equitable assignment of such character that the assignor parts with all control over the disposition of the insurance and cannot change the beneficiary in violation of his contract, is in accord with the purpose of the statute and the

liberal construction thereof which must be made to protect the interests of those for whose benefit the statute was enacted. The proof herein is wholly insufficient to establish such a contract.

In sustaining the defendants' motion herein, the able trial court stated:

"The cases are clear I think that a mere expression of an intention or even a statement that the arrangements had been made are insufficient to constitute such an arrangement and agreement as contemplated by the statute. In fact, that is the substance of all of the evidence, is that such an arrangement or agreement had been made. I think there is insufficient evidence, taking it in the most favorable light, to submit to the jury on whether or not such arrangement was made in consideration of a loan or renewal, or in either case. The case to me is more similar to the Hazeldine case than the Estate of Paul. In the Estate of Paul the arrangements were made direct by the decedent with the claimants, the doctor, the undertaker and boarding house, made upon his assurance that they were to be paid out of his life insurance proceeds. They proceeded to render the services, for which they afterwards made claim. The fact that he believed he arranged his insurance or that he intended to arrange it, I think is the extent of your evidence in this case, neither of which was brought home to the plaintiffs or upon which they relied."

We agree with the trial court. The evidence was insufficient to establish the type of agreement that must be shown to meet the mandate of the statute. Other questions, that are argued in the briefs, need not be considered or decided.

The judgment is—Affirmed.

MANTZ, C. J., and MULRONEY, HALE, OLIVER, WENNERSTRUM, and SMITH, JJ., concur.

GARFIELD and BLISS, JJ., dissent.

GARFIELD, J. (dissenting)—I respectfully dissent.

The claims are based on promissory notes signed by decedent, said to have been given for money borrowed by him. There is

no suggestion that the claims are unjust. There can be little doubt that decedent wanted and intended these claims to be paid out of this life-insurance money and believed he had arranged for such payment. Decedent's intention to waive the benefit of the exemption provided by sections 8776 and 11919, Code, 1939, clearly appears—or at least the jury could have so found. Further, I think there is substantial evidence for submission to the jury "of an agreement or assignment" under section 8776, or of a "special contract or arrangement," under section 11919, by which the insurance should be applied to this indebtedness. Our decisions recognize that such an agreement may be by parol. In re Estate of Paul, 231 Iowa 1078, 1080, 3 N. W. 2d 186, 187.

Claimants were handicapped in proving their case. The lips of the contracting parties were sealed, decedent's by death and claimants' by the dead man statute, Code section 11257. Of course, this did not relieve claimants from proving their case, but it is a proper matter to consider, especially where, as here, it cannot be contended the claims are fictitious or even unjust. See Soderland v. Graeber, 190 Iowa 765, 775, 180 N. W. 745.

The majority apparently assumes, as did the trial court, that there must be direct evidence of an agreement regarding the insurance. But an agreement, like any other fact in issue, can be established by circumstantial evidence. In re Estate of Oldfield (Gaynor, J.), 175 Iowa 118, 122, 156 N. W. 977, L. R. A. 1916D, 1260, Ann. Cas. 1917D, 1067; Feltes v. Tobin (Ladd, C. J.), 187 Iowa 11, 22, 171 N. W. 739; 32 C. J. S. 1099, section 1039; 20 Am. Jur. 1041, 1042, section 1189.

Since the claims were tried to a jury, they could be proven by only a preponderance of the evidence. Clear, satisfactory, and convincing proof that is required in equity to establish an oral contract of a decedent was not necessary. In re Estate of Dolmage (Faville, J.), 204 Iowa 231, 213 N. W. 380, and cases cited; In re Estate of Newson (Morling, J.), 206 Iowa 514, 524, 219 N. W. 305; In re Estate of Stratman, 231 Iowa 480, 487, 1 N. W. 2d 636, 642.

In passing on the sufficiency of the evidence, I think the testimony of W. N. Mintonye, which the majority does not mention, is properly to be considered on the Brunt claim as well

as the McCaffreys' claims. I see no basis for confining its consideration to the McCaffreys' claims as the trial court ruled. No question is raised as to the competency of this witness. He testified that about three years before, in the fall, he overheard this talk between his wife, Ida Mae, decedent's niece, and decedent, in the witness' home:

"My wife was ill at the time and Wig Harding came to see her * * * he say, you know Mrs. Brunt has been—Minnie he called her—has been worrying so much about the bill that I owe her that I have made arrangements and agreed to pay her out of that insurance providing that I die before I get it paid, because I want Mrs. Brunt to be paid. * * * Q. Did he state who he had made those arrangements with? A. With Minnie Brunt."

Ida Mae Mintonye testified that claimant Minnie Brunt was present three days before decedent's death at the conversation which the witness related and to which the majority refers.

As stated by the majority, Minnie Brunt testified that on July 10, 1941, decedent said in her presence, "that he had these debts to pay, and he says—with the McCaffreys. * * * And he says, I have made an agreement and arrangements that if I don't get their debt paid while I am here on earth that I will pay it out of my insurance, which he was carrying."

Will Walters testified that decedent told him in September or October 1941, "you know that I owe Minnie [Brunt]? and I says, yes. He says, I am going to pay her every dollar I owe her, and I have arranged and agreed to pay with my insurance."

Anna McCaffrey testified that in September 1941, decedent "remarked to me about Minnie Brunt being worried about the debt he owed her. And he said she had no reason to worry, that when she renewed the note that she renewed it on the strength of that insurance policy which he expected her to be paid out of. * * * Well, he said that he had made an arrangement with her. Q. With who? A. With Minnie Brunt. Q. To what effect? A. To have this—or this note paid out of this insurance policy if he did not get it paid before his death."

Carl McCaffrey testified that subsequent to July 10, 1941, decedent said in his presence:

"I have arranged and made an agreement if I should die before I get her [Minnie Brunt's] debt paid off that I have got insurance money to pay it afterwards, after my death; I have got it fixed in that way."

I think the foregoing, together with other evidence clearly showing decedent's intent that these debts be paid from this insurance money, was sufficient to warrant a finding that decedent had made a binding agreement to that effect.

I do not agree that the record is similar to that in In re Estate of Donaldson, 126 Iowa 174, 101 N. W. 870, and In re Estate of Hazeldine, 225 Iowa 369, 280 N. W. 568. The Hazeldine case was in equity, as was In re Estate of Paul, 231 Iowa 1078, 3 N. W. 2d 186. As stated, in an equity case of this kind the proof must be clear, satisfactory, and convincing. The Donaldson case was tried to the court without a jury and the extent of the evidence is that "deceased promised [claimant] to take out a life insurance policy payable to his estate in the belief that, if he died, the avails thereof could be used for the payment of his debts. He made no special contract or agreement that it should be so used, but both parties relied upon a mistaken view of the law." Pages 178, 179 of 126 Iowa, page 871 of 101 N. W.

In the Hazeldine case there was no evidence from any competent witness of any agreement. The only testimony, even from the incompetent witness, is that decedent told claimant and the witness "that he carried insurance policies and that they were the beneficiaries." Page 382 of 225 Iowa, page 575 of 280 N. W.

I think the case for claimants here is almost if not quite as strong as it was in the Paul case, supra, where we held, reversing the trial court, that an oral agreement was shown by clear, satisfactory, and convincing evidence that the insurance should inure to the benefit of creditors of insured decedent.

I would reverse.

BLISS, J., joins in this dissent.