619 F.2d 840
 26 UCC Rep.Serv. 528
 SECURITY NATIONAL BANK, a National Banking Association,
Plaintiff-Appellee,
v.
BELLEVILLE LIVESTOCK COMMISSION CO., INC., and Lowell
Darcey, an Individual d/b/a Belleville Livestock
Commission Co., Defendants-Appellants,
and
SECURITY NATIONAL BANK, a National Banking Association,
Plaintiff-Appellee,
v.
GLASCO LIVESTOCK EXCHANGE, INC., a corporation, Defendant-Appellant,
and
SECURITY NATIONAL BANK, a National Banking Association,
Plaintiff-Appellee,
v.
OSBORNE LIVESTOCK COMMISSION, INC., a Corporation,
Defendant-Appellant.
 Nos. 76-2113 to 76-2115.
 United States Court of Appeals,
Tenth Circuit.
 May 4, 1979.
Rehearing Denied May 30, 1980.
 
 Maureen E. McGrath, Omaha, Neb. (Kutak, Rock, Cohen, Campbell, Garfinkle & Woodward, Omaha, Neb., and John Q. Royce of Hampton, Royce, Engleman & Nelson, Salina, Kan., on brief), for plaintiff-appellee.
 Gerald Sawatzky, Wichita, Kan. (James D. Oliver, Wichita, Kan., and Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., of counsel, on brief), for defendants-appellants.
 Edward W. Rothe and James T. Malysiak of Freeman, Rothe, Freeman & Salzman, Chicago, Ill., on brief, for Iowa Beef Processors, Inc., as amicus curiae.
 Before HOLLOWAY, BARRETT and McKAY, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 Defendant-appellant livestock auctions ("Belleville," "Glasco," and "Osborne") have taken these timely appeals to review a summary judgment for the plaintiff Bank in three conversion cases brought by the Bank, claiming conversion by the auction companies of cattle covered by its security agreements. The primary issues are (1) whether the Bank impliedly waived its security interest in cattle sold by its debtor by its course of conduct, custom, usage or procedure in accepting proceeds of unauthorized sales of cattle covered by security agreements without remonstrating with the debtor for violating the agreements, and (2) whether the Bank gave express consent to the sales in question, without requiring arrangements to protect its security interests. Other contentions will also be treated.
 
 
 2
 We will first outline the basic facts which underlie the controversy.[1]
 
 
 3
 * THE FACTUAL BACKGROUND
 
 Larkins' transactions with the Bank
 
 4
 In May, 1969, the Security National Bank of Superior, Nebraska, commenced lending money to one Dale E. Larkins, who, with his father, Clarence Larkins, owned a 120 acre farm across the state line in Republic County, Kansas. The principal purpose of these periodic loans was to finance Larkins in purchasing cattle weighing from 300 to 400 pounds. Larkins generally fed the cattle for three months and sold them at a weight of 600 to 700 pounds, at which point the cattle were ready to enter regular feed lots for feeding by others in preparation for slaughter.
 
 
 5
 On May 14, 1969, the Bank filed a financing statement with the Register of Deeds, Republic County, Kansas, listing Dale E. Larkins, Clarence Larkins and Paralee Larkins as debtors. The financing statement, however, was signed only by Dale Larkins and a Bank officer. (Defs, Ex. 2; Ex. A. 122). The financing statement covered:
 
 
 6
 All equipment, all farm products including but not limited to crops, livestock, supplies used or produced in farming operations, contract rights, and accounts.
 
 
 7
 Presumably a security agreement was signed at that time, but, if so, it is not available, having been replaced by later security agreements, including agreements on November 2, 1972, May 10, 1973, and November 10, 1973. (Defs. Exs. 7, 8, 1; Ex. A. 126, 128, 120). The last of these three agreements governs the rights which the Bank seeks to assert in this lawsuit.[2] That agreement described the collateral as 986 cattle, consisting of "mixed steers" of varying weights, having an estimated value of $327,737.00. A cattle count taken at Larkins' ranch on November 23, 1973, roughly verified this number of cattle and their value. (Ex. A. 131-32). The security agreement also covered all proceeds of the collateral, and secured payment of existing and future indebtedness of Dale Larkins to the Bank.
 
 
 8
 In the agreement Larkins covenanted that (A. 121):
 
 
 9
 Borrower will not sell, lease, mortgage, pledge or encumber the Collateral, permit its identity to be lost, permit it to be levied upon or attached under any legal process, create any security interest therein (except that created hereby), or otherwise dispose of the same or any of Borrower's rights therein.
 
 
 10
 Borrower will not remove the Collateral from the county where it is now or hereafter located without the prior written consent of Bank, will give to Bank a complete description of the location to which the Collateral is moved, and will permit Bank to inspect the Collateral at any time.
 
 
 11
 The agreement provided that the following occurrences would constitute events of default which would entitle the Bank to invoke certain sanctions:
 
 
 12
 It is agreed that each of the following events or occurrences shall be an "Event of Default" under this Agreement: (1) failure of Borrower to pay any indebtedness or to perform any obligation secured by this Agreement; (2) breach by Borrower of any of the covenants, conditions, warranties or agreements contained herein . . .
 
 
 13
 Upon the occurrence of any Event of Default, all indebtedness secured by this agreement shall become immediately due and payable in full without demand or notice, and Bank may proceed to exercise one or more of the rights and remedies accorded by the Uniform Commercial Code or otherwise by law . . .
 
 
 14
 Each year the Bank took an inventory of the cattle located on Larkins' farm. On occasion, when his loan needs were under review Larkins advised the Bank of his plans for selling cattle from time to time in the future. Despite the provision forbidding Larkins to sell livestock, on several occasions he sold cattle without the Bank's advance knowledge. When he made these sales, Larkins listed himself as owner and consignor of the cattle. He received payment for the cattle consigned and sold on his behalf in his own name. He then deposited the proceeds of the cattle sales in a checking account held jointly with his father, Clarence Larkins. When the Bank subsequently learned of these sales, it did not reprimand Larkins in any way.
 
 
 15
 On March 7, 1974, the Bank discovered that Larkins had apparently disposed of several hundred cattle in the preceding months, without replacing them with other cattle purchased by him. (A. 264 et seq.). Instead, Larkins had, at some point, decided to go into the contract feeding business and was then feeding several hundred cattle owned by others. At this time, Larkins was indebted to the Bank in a substantial amount, and the remaining cattle which he owned were insufficient to pay his indebtedness.
 
 
 16
 Immediately after the March 7, 1974, discovery, the Bank sold the cattle on Larkins' premises claimed by him. Cattle not claimed by Larkins were returned to their owner, Omar Miller, and thirty head, whose ownership was in doubt, were sold and the proceeds divided evenly between the Bank and Mr. Miller. The Bank then obtained from Larkins all his other unsecured property, including machinery, his farm, and farmhouse and all improvements, life insurance policies, etc., as substitute collateral for the cattle disposed of by Larkins prior to March 7, 1974.
 
 
 17
 Thereafter, on August 5, 1974, the Bank, for the first time, wrote to the defendant livestock auction companies contending that defendants converted cattle because Larkins' sales of various cattle through the defendants were "not authorized by the bank nor were the proceeds realized forwarded to the Bank." (Pls. Ex. 26; Ex. A. 27).
 
 The Defendant Livestock Auction Companies
 
 18
 The defendant livestock auction companies are located in three towns in northern Kansas: Belleville, Osborne, and Glasco. Dale Larkins had bought and sold cattle at all three auctions frequently for several years prior to March 7, 1974. Livestock auctions are held each week by each company, on different days. Almost all the livestock sold arrive at the auction pens the same day as the sale. When cattle arrive, a state form is filled out showing the owner or consignor, and under state law (K.S.A. 47-1007) the sales proceeds must be paid to the person or persons so listed. This, in fact, is what the auction companies do. They pay the seller (owner or consignor) the same day of the sale, and collect from purchasers promptly. (A. 80, 110, 133).
 
 
 19
 Larkins was known to the personnel of all three auction companies, although none of the defendants had any actual knowledge that the Bank claimed a security interest in cattle consigned for sale by Larkins. He had always indicated he owned the cattle he brought in, and he listed himself as owner and consignor on all auction sales. None of the livestock auction companies ever checked any UCC filings either at the county level or at the state Secretary of State's office.
 
 
 20
 Although the Bank knew that Larkins had regularly bought and sold cattle at the defendants' auctions and that sales proceeds were paid to Larkins who deposited them into the joint account with his father, the Bank at no time advised any of the defendants of its claimed security interest in the cattle sold by Larkins, and never requested either Larkins or defendants to list its name as an interest holder on the checks or any other document; nor did it ever request Larkins to endorse proceeds checks directly over to the Bank. Rather, the Bank trusted Larkins to make periodic payments on his debt as he was able. This normally occurred after cattle were sold. (A. 218-19).
 
 
 21
 Glasco Livestock Exchange, Inc.
 
 
 22
 Roland Nothern and his father, Leon, started this livestock auction in 1959, and incorporated in 1972. On November 21, 1973, Larkins purchased 99 Colorado yearlings, not at the weekly Glasco auction but through Nothern's dealer operation. On November 24, 1973, Larkins gave Nothern two checks in payment for the cattle, one for $28,000.00 and one for $9.56. Larkins told Nothern that the checks would not be good until he sold some cattle, and, this being normal, Nothern agreed to hold the checks until Larkins sold the cattle he had in mind.
 
 
 23
 On November 26, 1973, Larkins then sold 95 cattle at Glasco, and the auction issued its check to Larkins for $26,960.35. Larkins in turn endorsed this check to Nothern and wrote another check for $1,040.00 so that Nothern could void the $28,000.00 check tendered by Larkins two days before.
 
 
 24
 Larkins told Nothern the 95 cattle being sold were his own. Nothern did not check financing statements on file because that was not his procedure. Nothern later learned that Larkins sold the 99 Colorado cattle at the Faubury, Nebraska, auction on Tuesday, November 27, 1973.
 
 Osborne Livestock Commission
 
 25
 Omar Miller was president of this company during the time in question. Larkins had periodically bought and sold cattle through the Osborne auction. On October 19, 1973, Larkins purchased cattle at Osborne but then told Miller he could not pay for them. He gave Miller a check for $24,000.00, which he asked Miller to hold, and a check for $759.18, which was cashed. Although Larkins promised to pay the following week, he gave Osborne a check for only $2,000.00 on November 7, and then proceeded to purchase additional cattle on November 8 and 9. On November 27, Larkins endorsed a $23,445.00 check from an unrelated sale in Nebraska to Osborne. Miller insisted on full payment for all the previous purchases, so on November 28, 1973, Larkins brought in 121 cattle for sale, and endorsed the proceeds check in the amount of $34,542.00 to Osborne. To square his account, he also gave Osborne a $20,475.26 check drawn on his Security National Bank account. Osborne subsequently cashed this check. In addition, on March 6, 1974, Larkins sold one head through Osborne for a total selling price of $155.80. Larkins endorsed the proceeds check he received to Omar Miller.
 
 Belleville Livestock Commission
 
 26
 Defendant-appellant Lowell Darcey operated as an auction company under the name "Belleville Livestock Commission Company," a sole proprietorship and as a livestock dealer under the name "LSD Cattle Company." Larkins regularly bought and sold cattle through Darcey's companies. On quite a few occasions Darcey had visited Larkins' farm to receive on consignment cattle which Larkins wanted to sell.
 
 
 27
 During October 1973, Larkins purchased 139 cattle from Darcey for $38,690.21, which amount he could not pay. Darcey borrowed money to purchase these cattle in his name, and he let Larkins "take the cattle on out to the country." (A. 94). Between November 3, and November 23, Larkins wrote Darcey three checks for $2,000.00, $2,000.00, and $862.78, respectively, in partial payment for the October purchase. Larkins paid the remainder by turning over the proceeds from cattle sales. Thus, on November 9, 1973, Larkins sold $4,326.76 worth of cattle at auction and endorsed the check over to Darcey. Although this transaction followed the pattern of those on which Security Bank bases its conversion theory, the Bank has not requested any relief from this transaction.
 
 
 28
 The sales which the Bank does complain about, however, began with two consignments of cattle on November 23, which brought $26,185.60 and $3,619.02, respectively. When Larkins endorsed these checks to Darcey, the October purchase was complete. Thereafter, from December 14, 1973, through February 22, 1974, Larkins sold various consignments of cattle through the Belleville Auction Company. A total of 166 cattle were sold for $33,588.77. (Pls. Exs. 17-25, Ex. A. 14-16). Darcey paid the proceeds of these sales to Larkins, who used the money for his own purposes, never paying the Bank anything.
 
 II
 
 29
 THE APPELLANTS' THEORY OF WAIVER OF THE SECURITY INTERESTS
 
 
 30
 Appellants contend that the trial court erred in ruling that as a matter of Kansas law the Security Bank did not impliedly consent to the debtor's sales of cattle by its course of conduct and by not reprimanding Larkins for failure to seek prior express authority for the sales.
 
 
 31
 At the time of the trial court's ruling there was no Kansas decision on the issue under the Uniform Commercial Code. Hence appellants relied on pre-Code Kansas cases and on Clovis National Bank v. Thomas, 77 N.M. 554, 425 P.2d 726, and similar decisions under the Code. However, we now have intervening decisions of the Kansas Supreme Court which confirm the trial judge's prediction of Kansas law and his rejection of the waiver theory. North Central Kansas Production Credit Ass'n v. Washington Sales Company, Inc., 223 Kan. 689, 577 P.2d 35; North Central Kansas Production Credit Ass'n v. Boese, 2 Kan.App.2d 231, 577 P.2d 824, aff'd by unpublished opinion, 588 P.2d 491 (Kansas Supreme Court, 1978; rehearing denied January 24, 1979).
 
 
 32
 In the Washington Sales case, the auction company argued that there was an authorization of the cattle sales in question and a waiver of the creditor's security interest in the cattle. The authorization and waiver were said to result, inter alia,[3] from the course of conduct by the secured party and its failure to admonish the debtor when sales of wheat and milk subject to the security interest were made. The auction barn and its surety argued for application of the Clovis case as opposed to Garden City Production Credit Association v. Lannan, 186 Neb. 668, 186 N.W.2d 99. The Kansas Supreme Court however, rejected their arguments. The Court relied on the provision of K.S.A. 84-1-205(4) concerning express terms of agreements and course of dealing, and stated (577 P.2d 35, 41):
 
 
 33
 The acceptance, by a secured party, of the proceeds from unauthorized sales of collateral by a debtor, without remonstrating with the debtor for violating the express terms of the security agreement, does not, standing alone, constitute an implied waiver of the security interest in the remaining collateral.
 
 
 34
 (W)e do not think (the Clovis ) rationale follows the intent of the framers of the Uniform Commercial Code, particularly as expressed in the sections of the code set forth above. We conclude that a ruling, following the Clovis doctrine, would hinder "the granting of credit to the capital-intensive agricultural industry" in this state; that such a holding is not in the spirit of the UCC, is not required by its terms, and would not be in the public interest. We therefore follow the rationale of Lannan, supra, and find no waiver of a security interest, and no consent to the sales here involved, by PCA's failure to remonstrate with Uffman, following his sales of milk and wheat.
 
 
 35
 Further, the Washington Sales opinion reasoned that waiver as understood both in terms of contract law and of equitable waiver was not established (id. at 41):
 
 
 36
 Certainly there was no waiver as that term is generally understood in contract law. Waiver generally implies 'that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right.' . . .
 
 
 37
 We also conclude that the equitable doctrine of waiver should not be utilized in favor of one who has constructive notice of a lien, and admittedly has been remiss in checking public records maintained, at least in part, for his protection.
 
 
 38
 As noted, in the Washington Sales case where the waiver argument was rejected, there were sales of wheat and milk which were said to have resulted in a waiver of the security interest in cattle sold later. The same ruling rejecting the waiver theory was then later made by the Kansas Court in the Boese case where only cattle were involved.
 
 
 39
 Thus appellants cannot argue here that the terms of the security agreement, the Bank's inaction, or its course of conduct, custom, usage or procedure waived its security interest in the cattle sold by the Appellants on behalf of the debtor. The ruling of the trial court on this issue was correct and is affirmed.[4]
 
 III
 THE THEORY OF EXPRESS CONSENT
 
 40
 While the Kansas court refused to adopt the Clovis line of cases in the Washington Sales opinion, it nevertheless found for the auction company on an express consent theory. Although the plaintiff production credit association's inaction could not constitute either an express or an implied waiver, certain statements by its officers to the debtor demonstrated express consent to the livestock sales.
 
 
 41
 The court held that "(a)n express authorization by the secured party of the debtor to sell collateral and to receive the proceeds constitutes an express waiver of the security interest in the collateral sold." 577 P.2d at 36. The reasoning was that when the debtor was given the right to sell the collateral and to collect the proceeds, the sale barn, as his agent, acquired the same right. Once it was established that the agent had authority to sell the property, it followed that he could not be a converter. Id. at 41. The further question for decision in this case, then, is whether the officers of the Bank expressly consented to the sale of the cattle by Larkins, with payment to be made to him. Id. at 41.
 
 
 42
 The Bank moved for summary judgment and supported its motion by affidavits. The Appellants cannot rest on the mere allegations or denials of their pleadings, but their response, by affidavits or otherwise as provided by the Rule, must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), F.R.Civ.P. The Appellants say that there is such an issue on the question of express consent on the basis of depositions and exhibits in the record.
 
 
 43
 The trial court's order states that "(t)here is absolutely no evidence that (the Bank) expressly approved the sales we are concerned with here." (A. 398). Since the trial court's ruling was by a summary judgment, we must consider the record in the light most favorable to the defendants. United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176. Where different ultimate inferences may properly be drawn the case is not one for summary judgment. Id. at 655. The summary judgment papers must be examined in the light most favorable to the party opposing the motion, and all ambiguities and disagreements must be resolved in his favor. Webb v. Allstate Life Insurance Co., 536 F.2d 336, 339-40 (10th Cir.).
 
 
 44
 The Bank supported its motion for summary judgment with affidavits of Messrs. Braun, Marcotte and Noren. They established the backgrounding operation of Larkins, and Marcotte and Noren discussed the Bank's course of dealings with Larkins and Defendant's Exhibits 4 and 5 (Ex. A. 123-25), relied on in part by Appellants as evidence of express consent to cattle sales by Larkins without joint payment to him and the Bank. (See Brief of Appellants 31 n. 2). The Marcotte and Noren affidavits state that Defendants' Exhibits 4 and 5 (notations made in 1971 about Larkins' plans) and the related discussions had with Larkins pertaining to his intentions for purchasing and selling cattle were not a waiver, and were not intended to be a waiver, of the Bank's security interest in the collateral or a consent to specific future sales of collateral. (A. 371, 376). These affidavits further stated that in its course of dealings with Larkins, the Bank had no intention of waiving its security interest in the secured collateral or their proceeds or consenting to future sales of collateral by accepting deposits of proceeds of sales that were "made without its prior knowledge and consent." (A. 370, 375).
 
 
 45
 However, to counter the Bank's showing and demonstrate express consent to the sales, Appellants rely, inter alia, on the depositions of Messrs. Marcotte and Braun, on a handwritten notation on the November 10, 1973, security agreement (Ex. A. 120; A. 279), and Defendants' Exhibits 4 and 5 (Ex. A. 123-24). The Marcotte deposition is particularly stressed by Appellants. The portion of the Marcotte deposition cited (see Brief of Appellants 31 n. 2), discussed a meeting by Mr. Marcotte, President of the Bank in 1973 and 1974, with Larkins on March 7, 1974, after the depletion of the collateral was discovered. It reads in pertinent part (A. 333):
 
 
 46
 Q. Was that the first time, then, that you discovered that Dale Larkins had sold some cattle, which the bank has alleged to had (sic) a security interest in, and did not account for the proceeds? A. Yes.
 
 
 47
 Q. Prior to this date, he had sold cattle many times, had he not, with your knowledge and approval and consent? A. Well, you understand, in a cattle operation such as that, it is pretty well agreed upon between the borrower and the lender that they, under normal conditions, you would sell and apply, or sell without coming prior to selling and asking if you can sell that particular number. You just
 
 
 48
 Q. Then is your answer to the question yes?
 
 
 49
 Mr. Campbell: Would you read the question (25) back, please.
 
 
 50
 (Question read by Reporter.)
 
 
 51
 A. Yes.
 
 
 52
 In addition, we note the testimony of Mr. Braun, which can be reasonably read to admit knowledge on the morning of November 22, 1972, of a sale to be completed later that day. (A. 244-45).[5] Taken together all the testimony arguably indicates express consent in terms of the Washington Sales case.
 
 
 53
 In any event, the materials relied on by the parties do not clearly settle the question of express consent. Examining all the depositions and affidavits in the light most favorable to these Appellants opposing the summary judgment, which we must do, Webb v. Allstate Life Ins. Co., supra, 536 F.2d at 339-40, we feel that the record does not rule out a genuine issue of material fact on express consent. The Washington Sales case itself, 577 P.2d at 41, was not one where specific sales were expressly approved in advance. The Kansas Court pointed to a general statement at the beginning of the loan as evidence of express consent. 577 P.2d at 41. Here, in the same vein, the Marcotte testimony and other statements, construed favorably to Appellants, may be viewed as an indication of such consent. Without in any way holding that there was express consent, we feel that the state of the testimony was sufficient to raise a factual issue. We cannot say that the Bank has demonstrated its entitlement to summary judgment on the express consent issue beyond a reasonable doubt. Mustang Fuel Corp. v. Youngstown Sheet & Tube Co., 516 F.2d 33, 36 (10th Cir.).
 
 
 54
 For these reasons the summary judgment for the Bank must be set aside. Since the cases are remanded for trial, we will however discuss other questions to determine which issues were properly disposed of by summary judgment and which issues remain to be tried.
 
 IV
 
 55
 THE SHOWING OF OWNERSHIP AND SECURITY INTERESTS IN THE CATTLE
 
 
 56
 Appellants have also argued that summary judgment was not proper because there exist two other genuine issues of material fact. More specifically, they contend that the showing in support of summary judgment did not demonstrate the absence of factual questions as to whether Larkins owned all the cattle converted by the defendants or that those cattle were all covered by the security agreement in favor of the Bank. On the other hand, the Bank maintains that it made such a showing and that the appellants have presented no evidence as to any specific facts demonstrating the existence of a genuine issue for trial as to ownership. See Rule 56(e), F.R.Civ.P.
 
 
 57
 The party moving for summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden, he is not entitled to judgment. Adickes v. S. H. Kress Co., 398 U.S. 144, 161, 90 S.Ct. 1598, 26 L.Ed.2d 142; Mustang Fuel Corp. v. Youngstown Sheet & Tube Co., 516 F.2d 33, 36 (10th Cir.). Thus, although the party resisting the motion cannot rest on his pleadings when the motion is supported by proper affidavits, depositions and the like, this rule applies only when the movant has established "such facts as would be admissible in evidence," and "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Riggs v. British Commonwealth Corporation, 459 F.2d 449, 451 (10th Cir.).
 
 
 58
 Here, although the Bank adduced proof as to the origin of the cattle in three sales, it has failed to demonstrate the absence of a genuine issue of material fact on others because it has failed to submit any proof that the cattle allegedly converted were cattle in which it held the requisite interest. A conversion involves an unauthorized assumption and exercise of the right of ownership over goods belonging to another. Desbien v. Penokee Farmers Union Coop. Ass'n, 220 Kan. 358, 552 P.2d 917, 924. Thus the plaintiff in a conversion action assumes the burden of proving a sufficient interest in the property allegedly converted. Although the Bank has shown that it held a security interest in 986 head of cattle and proceeds, it has not necessarily shown that all the cattle allegedly converted were Larkins' cattle covered by the agreement.
 
 
 59
 The Bank did submit the affidavit of one Elvin Ball, owner and operator of the Ball Truck Line, to the effect that the records of Ball Truck Line reflect the following numbers of cattle which it picked up from Dale Larkins' farm near Republic, Kansas, and transported to the following locations (A. 377-78):
 
 
 60
 11/23/73 101 head cattle to Belleville, Kansas
 
 11/26/73 95 head cattle to Glasco, Kansas
 
 61
 11/28/73 (unknown number) head cattle to Osborne, Kansas
 
 
 62
 When coupled with the deposition testimony (A. 251-57) and the affidavit (A. 663-65) of Harold Braun, agricultural representative of the Bank, who took a head count of cattle represented to him to be Larkins' on November 23, 1973, it appears that the Bank proved its interest in the cattle involved in the November 23 sale at Belleville of 101 head, the November 26 sale at Glasco of 95 head, and the November 28 sale at Osborne of 121 head. Accordingly on retrial the Bank's interest in these cattle will not be in issue.
 
 
 63
 However, with regard to the other sales in question, sufficient proof of the origin of the cattle involved therein has not been adduced. This defect is fatal to summary judgment, especially in light of deposition testimony by Omar Miller that on January 11, 1974, he delivered 486 cattle to Larkins for feeding. (A. 137). Miller also indicated that he might have had some Hereford on Larkins' ranch before January 11, and this possibility is further supported by plaintiff's exhibit 41 (Ex. A. 45), which is the invoice for a sale of cattle to Miller on December 29, 1973. Therefore, as to all sales after December 29, 1973, a genuine issue of material fact exists as to whether the cattle sold by Appellants were actually Larkins' cattle covered by the November 10, 1973, security agreement.
 
 
 64
 With regard to the three earlier sales through Belleville on November 23, 1973 (13 head); December 14, 1973 (10 head); and December 21, 1973 (16 head), although there appears to be no allegation that Larkins had already commenced his feeding operation for others, Darcey nevertheless responded in his answer that he was without sufficient knowledge to admit or deny the allegation that the cattle sold were also the cattle named in the security agreement. Since such a response is treated as a denial, the absence of a showing[6] that the security interest of the Bank covered these cattle prevents a summary judgment as to them. See United States v. Big Z Warehouse, 311 F.Supp. 283 (S.D.Ga.); United States v. Bartholomew, 137 F.Supp. 700, 709 (W.D.Ark.); Satterfield v. Knippel, 169 S.W.2d 795 (Tex.Civ.App.).
 
 
 65
 In sum, as to all sales except the first three sales discussed above, on remand the Bank must prove as one element of its case that the cattle sold were the same cattle covered by its security interest if it is to prevail.
 
 V
 
 66
 THE CLAIM THAT THE CATTLE WERE "INVENTORY" OF A CATTLE TRADER
 
 
 67
 Finally, Appellants contend that there was sufficient evidence that Larkins was engaged in cattle trading as opposed to cattle feeding to preclude the entry of summary judgment for the Bank. The argument is that Larkins was a cattle trader, that the cattle could not be considered "farm products" under K.S.A. 84-9-109(3), that instead they were "inventory" under K.S.A. 84-9-109(4), that the Bank improperly filed the financing statement in the office of the register of deeds of the county of the debtor's residence, since K.S.A. 84-9-401(1)(c) requires filing of financing statements covering security interests in inventory with the Secretary of State. Thus, Appellants say the Bank has no valid security interest and cannot prove an ownership interest which is a necessary element of any action for conversion.
 
 
 68
 Appellants have postured this argument in terms of the existence of a genuine issue of material fact. Yet, the Bank does not challenge the factual basis for appellants' argument that Larkins was a cattle dealer. Rather the Bank's quarrel is with the appellants' legal characterization of those facts. Appellants find the facts here similar to those in First State Bank v. Maxfield, 485 F.2d 71 (10th Cir.). Appellee finds Maxfield distinguishable and relies instead on Swift and Company v. Jamestown National Bank, 426 F.2d 1099 (8th Cir.). In this posture we find no genuine issue of material fact, and the only question for consideration is whether the Bank was entitled to judgment as a matter of law on this issue.
 
 
 69
 We accept the reasoning of the trial court that the Maxfield case is distinguishable. In Maxfield the very sales that were the object of the suit were themselves evidence of the debtor's cattle dealing. Here, however, with regard to the Glasco sale, there is no claim that the cattle which were part of Larkins' alleged dealing in cattle were the same cattle which the Bank claims were converted.[7] With respect to the Osborne sale on November 28, it is true that Miller's deposition states that he thought he recognized 40 of the 121 head as cattle which Larkins had purchased through his market one month earlier. (A. 156). Yet, in a "backgrounding" operation, a purchase and sale within one month is not unusual if the cattle are near market weight when acquired. (A. 364). Thus, although the typical feeding period might be from sixty to ninety days, the Maxfield case does not logically apply here since the principal resales in Maxfield occurred within twenty-four hours.
 
 
 70
 We conclude, therefore, from the uncontroverted facts that Larkins was not a cattle dealer and that the Bank filed the financing statement in the proper place. On remand Larkins must be treated as a cattle feeder.
 
 
 71
 Accordingly, the judgment is affirmed in part and reversed in part as provided herein, and the causes are remanded for further proceedings in accord with this opinion.
 
 
 
 [1]
 The facts stated in Part I are those established without any material dispute in the record preceding the summary judgment
 
 
 [2]
 Thus, the sales in controversy in these appeals are all the sales occurring after November 10, 1973, which are detailed later in this opinion
 
 
 [3]
 In addition to the contentions on waiver based on the course of conduct of the secured party, in Washington Sales the argument was made that the language of the security agreements themselves (permitting sales of collateral by the debtor conditioned on joint payment to the debtor and the secured party), effected an authorization for the sales and waiver of the security agreement
 
 
 [4]
 We also agree with the trial court's rejection of any theory of estoppel. (A. 402). There was no actual reliance by the appellants on conduct of the Bank. See Washington Sales, 577 P.2d at 38. The Bank properly perfected its security interest by filing the financing statement and no showing of misleading conduct was made
 While there was no issue of estoppel decided in the Washington Sales case, the opinion did reject the contention that the creditor's common practice, custom, usage and procedure constituted a waiver. Since the appellants rely essentially on those same factors as a predicate for an estoppel against the Bank (see Brief of Appellants, 34-35), we feel that a showing to establish an estoppel has likewise not been made.
 
 
 [5]
 This testimony of Mr. Braun reads as follows: (A. 244-45):
 Q. Then the cattle had already been sold prior to 11/24/72? A. Yes, they were it is my estimation, and more information on this, that there were one hundred and thirty-seven cattle in Osborne, for the sale, the day that I was out there in the morning and counted the balance of these cattle, Dale told me that there was one hundred and thirty-seven cattle in Osborne to be sold that afternoon, on the 22nd.
 Q. On the 22nd, Dale Larkins told you there were one hundred and thirty-seven cattle in Osborne, Kansas? A. Yes.
 Q. That was to be sold the afternoon of November the 22nd? A. Yes.
 Q. And when did he tell you that? A. The morning of the 22nd, when I was out there, and counted the rest of these cattle.
 (39) Q. And then he was in the bank on two days later on the 24th? A. Yes.
 Q. And told you that one hundred and thirty-five head had been sold? A. Yes.
 Q. And this was referring to the one hundred and thirty-seven head that's mentioned here? A. Yes.
 Q. And so you consented to the sale of those cattle? A. Because it was already sold, yes, and he told me in the morning that it was.
 Q. What was done with the proceeds of the sale? A. Let's see 11/24/72, he applied
 Q. Would you please answer that question? Do you know what the question is? A. He reduced it down by $34,000.00.
 
 
 [6]
 Although the record does indicate that Larkins may have told Harold Braun that the cattle sold on November 23, 1973, came from Larkins' ranch right after the headcount (A. 302), this is not the type of testimony which, even if admissible, can be relied upon to support a summary judgment. See Harlan Production Credit Ass'n v. Schroeder Elev. Co., 235 Iowa 345, 112 N.W.2d 320
 
 
 [7]
 It appears that on one occasion Larkins brought in 99 cattle to his feeding operation to mislead the Bank (A. 298) and then resold them soon after the deception was complete. Neither party denies that this subsequent sale took place, but it is not a sale for which the bank seeks any recovery. With respect to the sales in question here, we are satisfied that the record demonstrated that Larkins was engaged in feeding lightweight cattle in a backgrounding operation. (A. 363-64, 369, 372)